[No. G045157. Fourth Dist., Div. Three. June 15, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
RODNEY LEPERE LITTLE, Defendant and Appellant.

**COUNSEL**

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOORE, J.**—Defendant Rodney Lepere Little was convicted of first degree residential burglary (Pen. Code, §§ 459, 460, subd. (a)), second degree commercial burglary (Pen. Code, §§ 459, 460, subd. (b)), and fraudulently using an access card (Pen. Code, § 484g). The jury found true the allegation that one who was not Little's accomplice was present in the residence during the commission of the residential burglary (Pen. Code, § 667.5, subd. (c)(21)). Little was sentenced to a total of 21 years four months in state prison. He appeals.

We reject Little's claims of error with respect to the nature of the crime, probable cause, the use of a prior felony conviction for impeachment purposes, and ineffective assistance of counsel. We hold that, for the purposes of Penal Code sections 459 and 460, a residence does not become an uninhabited dwelling just because the owners thereof leave the premises while a Realtor conducts an open house on their behalves. We also express our view that *People v. Jacobs* (2000) 78 Cal.App.4th 1444 [93 Cal.Rptr.2d 783], concerning the use of prior felony conviction evidence to impeach a nontestifying defendant's credibility, is well reasoned and should be applied to the facts of this case.

I

FACTS

On June 27, 2010, Realtor Janice Konkol was holding an open house at a residence in Irvine. Little and companion Nakeyia Shipman entered the property. They split up once inside and Konkol was speaking with Shipman while Little was out of sight for at least five minutes. After Little and Shipman left the house, Konkol realized that her wallet, containing credit cards, a Nordstrom's gift card and a winning lottery ticket, was missing from

her purse. She looked around the property and inside her car for the wallet, and contacted her roommate to see if by any chance she had left the wallet at home. Having been unable to locate the wallet, Konkol called the police.

Police Sergeant Michael Hallinan was out in the field when he heard a police radio dispatch concerning the theft of the wallet. He spotted a pickup truck matching the one described in the dispatch and containing two people matching those described in the dispatch. He made a traffic stop, searched the vehicle and found Konkol's credit cards in between the seats.

A police officer transported Konkol to the intersection in Irvine where Little and Shipman had been detained. Konkol made a field identification of Little and Shipman at that time.

Little was convicted of first degree residential burglary, second degree commercial burglary, and fraudulently using an access card. He appeals.

## II

## DISCUSSION

### A. *Introduction*

Little argues (1) the burglary was not a first degree burglary, as a matter of law; (2) the search of the truck was made without probable cause; (3) it was an abuse of discretion to admit his prior theft conviction; and (4) he did not receive effective assistance of counsel. We shall address these contentions in turn.

### B. *First Degree Burglary*

Penal Code section 460, subdivision (a) provides: "Every burglary of an inhabited dwelling house, . . . or the inhabited portion of any other building, is burglary of the first degree." Penal Code section 459 states in pertinent part: "As used in this chapter, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

Little contends that while the open house was being held by the real estate agent, the home was not "currently being used for dwelling purposes" within the meaning of Penal Code section 459. Rather, he says, during the open house, the home was being used for exclusively commercial purposes. Consequently, he contends, he cannot have committed first degree burglary within the meaning of Penal Code section 460, subdivision (a).

Little cites *People v. Rodriguez* (2004) 122 Cal.App.4th 121 [18 Cal.Rptr.3d 550], which provides: "Burglary of a structure that is not an 'inhabited dwelling house' is burglary of the second degree [citation] . . . . 'Burglary of business premises, even though such premises might have people on them, is not burglary of the first degree because it does not carry the peculiar risks of violence and resulting injury which inhere in the burglary of a home. [Citation.] . . .' [Citation.]" (*Id.* at pp. 132–133.)

However, Little cites no case for the proposition that when a homeowner invites a real estate agent or other person into the home to conduct some business on his or her behalf, the property is converted from an "inhabited dwelling house" into business premises. Whether at the crucial moment the homeowner is at home, on the one hand, or is using the home for business-related purposes, on the other hand, is not determinative.

▉ " 'For purposes of the California first degree burglary statute, a structure "need not be occupied *at the time*; it is inhabited if someone lives there, *even though the person is temporarily absent*." [Citations.] A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters. [Citations.]' [Citation.]" (*People v. Meredith* (2009) 174 Cal.App.4th 1257, 1266 [95 Cal.Rptr.3d 297].) ▉ Here, there is no dispute that the owners of the home still lived there, even though they were temporarily absent from the home at the time Little entered. Therefore, the home was "inhabited" during the period of the open house.

"[W]e look to the intent of the occupier or person entitled to occupy the dwelling to determine if it is inhabited within the meaning of Penal Code section 459." (*People v. Marquez* (1983) 143 Cal.App.3d 797, 801 [192 Cal.Rptr. 193].) " '[A]fter a man has established a house as his dwelling it retains this character so long as he intends it to be his place of habitation even though he and his entire household are away . . . .' [Citation.]" (*Id.* at pp. 801–802.) " 'It has never been held that a person loses his residence by reason of a brief absence from the house where he lives, and without evidence of an intention to depart therefrom and go live in some other place.' " (*Id.* at p. 802, fn. omitted.)

Little cites only one case, *People v. Lewis* (1969) 274 Cal.App.2d 912 [79 Cal.Rptr. 650], wherein the property in question was being used for commercial purposes. In that case, the perpetrators were hiding in a supermarket at closing time, and engaged in a fight with the security guard inside the store. (*Id.* at pp. 914–915.) The Attorney General argued that, inasmuch as employees were on the premises at the time, the supermarket was an inhabited building within the meaning of Penal Code section 460. (*People v. Lewis, supra*, 274 Cal.App.2d

at p. 916.) The court rejected that argument, holding that there was "no evidence that the building was occupied as a dwelling, or living quarters." (*Id.* at pp. 921–922.)

The fact that a supermarket was held not to be an inhabited building despite the fact that employees were inside the building when the activity in question took place does not mean that the residence in question in the matter before us was not an "inhabited dwelling" within the meaning of the statute. In *People v. Lewis, supra,* 274 Cal.App.2d 912, a supermarket was at issue. Just because people were on the premises, it did not make a supermarket an "inhabited" building. Here, simply because a real estate agent was on the premises, that did not turn the residence into an uninhabited commercial property. The residence was still a residence and the homeowners continued to own it. There is no suggestion that the homeowners in this case had abandoned their home with no intention of returning. They were just temporarily absent at the time Little was there. They still inhabited the residence within the meaning of the statute. (*People v. Marquez, supra,* 143 Cal.App.3d at pp. 801–802.)

The Attorney General puts it well: "Finally, [Little's] position, if adopted, would lead to unintended consequences. For instance, if a person worked out of his home, the home would be a 'business' when the person was working, but a 'residence' when the person was taking a break. Or, a property would lose its residential character every time the maid or gardener was there to work, as long as the homeowner was away." Certainly, this cannot be the case.

## C. *Probable Cause for Search*

### (1) *Factual background*

On June 27, 2010, Police Officer Alexandria Lopez was dispatched to the residence and interviewed Konkol there. She obtained a description of the man and woman who had been in the house and of the truck they were driving. Officer Lindsay Davis, who was with Lopez at the time, sent out a general broadcast regarding the suspects.

When she testified, Lopez could not recall everything that Davis had stated in the broadcast, but she did remember quite a bit of it. The broadcast stated that a male and female, both Black, were driving a red F-150 truck with large chrome rims. The male was wearing a white shirt and the female was wearing a green dress. Lopez could not otherwise remember the full extent of the description Davis gave regarding the clothing, but could remember that Davis did describe the clothing.

Hallinan testified that he heard a dispatch broadcast about a wallet stolen from a residence, and several broadcast updates. The initial dispatch to the house was made about 1:42 p.m. A dispatch describing the suspects was made several minutes later. It described a Black male in his 50's, about five feet 10 inches tall, weighing 165 pounds, and wearing a light-colored shirt. The other suspect was a Black female in her 30's, wearing a green dress. The vehicle was a red Ford F-150 pickup truck with chrome rims.

About 2:15 p.m., Hallinan was at an intersection several miles away from the scene of the crime, and in the same city, when he saw a red F-150 pickup with chrome rims, transporting a Black male and a Black female whose ages matched those stated in the dispatch. He conducted a traffic stop. As he approached the pickup, Hallinan could see that the woman, Shipman, was wearing a green dress. The man, Little, was wearing a light-colored, grayish shirt. Hallinan asked Shipman if she had been to an open house in Irvine and she replied that she had. He requested permission to search the vehicle, but Shipman denied the request. Hallinan nonetheless searched the vehicle and found a flyer for the open house and also found Konkol's credit cards in between the seats. He asked if he could search Shipman's purse, and she consented. Inside the purse, he found a Nordstrom's gift card and a winning lottery ticket.

Little filed a motion to suppress the evidence obtained as a result of the search of the truck. He argued, inter alia, that there was no probable cause to search the truck. The court denied the motion. He renews his argument on appeal.

(2) *Analysis*

■ "A defendant may move to suppress evidence on the ground that '[t]he search or seizure without a warrant was unreasonable.' (§ 1538.5, subd. (a)(1)(A).) A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. [Citation.]" (*People v. Redd* (2010) 48 Cal.4th 691, 719 [108 Cal.Rptr.3d 192, 229 P.3d 101].)

■ " 'If there is probable cause to believe a vehicle contains evidence of criminal activity [citation], . . . a search of any area of the vehicle in which the evidence might be found [is permitted].' [Citation.]" (*People v. Hochstraser* (2009) 178 Cal.App.4th 883, 902 [100 Cal.Rptr.3d 728].) To determine the existence of probable cause, we consider whether under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 103 S.Ct. 2317].) Put another

way, "probable cause to search [exists] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found [citations]." (*Ornelas v. United States* (1996) 517 U.S. 690, 696 [134 L.Ed.2d 911, 116 S.Ct. 1657].)

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' [Citations.]" (*People v. Redd, supra,* 48 Cal.4th at p. 719, fn. omitted.)

At the hearing on the suppression motion, the court heard evidence and then orally stated its reasoning for denying the motion. The court first addressed the detention—the initial traffic stop. The court noted the following factors: (1) the truck was stopped only 33 minutes after the initial dispatch was sent out; (2) it was stopped in the city in which the crime occurred, and only about three miles away from the scene of the crime; (3) the truck was "somewhat unique" in that it was a red Ford F-150 with chrome rims; and (4) two Black people were in the truck—one male in his 50's and one female in her 30's. Altogether, there were a vehicle match, temporal and geographic proximity, and racial, gender and age matches. The court opined, "it would [have been] police negligence not to at least inquire as to whether that vehicle was involved."

The court then stated that after the stop, Hallinan obtained additional information that bore upon probable cause to search the vehicle. He learned that the subjects had been at an open house. The court found that this information, combined with the information leading up to the stop, established probable cause.

On appeal, we conclude the trial court's factual findings are supported by substantial evidence, in the form of Hallinan's testimony. In exercising our independent judgment, we determine that, on the facts so found, the search was reasonable, as based on probable cause. Under the totality of the circumstances, a man of reasonable prudence would have been warranted in the belief that evidence of a crime would be found in the truck. (*Ornelas v. United States, supra,* 517 U.S. at p. 696; *Illinois v. Gates, supra,* 462 U.S. at p. 238.)

Little argues to the contrary. He claims the evidence was insufficient to support this finding. He contends the evidence only "established was that the perpetrators were a black male and female, they were wanted for a common crime, and the defendants were in the same city as where the crime occurred." We disagree.

Little and Shipman, in addition to both being Black, were of the correct ages, were wearing the clothing that matched the dispatch descriptions, and were driving a red Ford F-150 pickup with chrome rims. They were located only about a half an hour after the first dispatch went out, about three miles away from the scene of the crime and within the city in which the crime took place. Furthermore, they admitted to having been at an open house. Under the totality of the circumstances, Hallinan had probable cause to search the truck. The court did not err in denying Little's motion to suppress.

## D. *Prior Theft Conviction*

### (1) *Background*

Count two of the information alleged that Little and Shipman entered a Target store with the intent to commit larceny. Count three alleged that, with the intent to defraud, they used a wrongfully acquired access card in order to obtain goods, services, money and other things of value.

A senior loss prevention specialist for the Target store located at Barranca and Culver in Irvine testified that a woman attempted to use two of Konkol's credit cards to make a $320 purchase at 1:51 p.m. on the date of the open house. However, each of the two credit cards was declined. In his opening brief, Little concedes that Shipman was the woman in the Target video surveillance tape.

Hallinan testified that he stopped the truck near the intersection of Culver and Alton Parkway. On recross-examination by defense counsel, Hallinan relayed that, at the time of the stop, Little said he and Shipman had both been to an open house. Little even showed Hallinan the flyer for the open house. Hallinan asked Little where he was coming from at the time they were pulled over. Little said he was coming from a church off Alton.

Defense counsel then asked Hallinan whether he had done any investigation to determine whether there was a church event at the location Little described. Hallinan replied that he did not need to because there were four or five churches on Alton and they all had functions that day, it being Sunday. Defense counsel then asked: "Did you do any investigation to corroborate or check if it was a lie as to what he was telling you was true?" Hallinan replied, "No."

The prosecutor argued that Little had made the statement about being at church as an alibi to show that he could not have been at the Target store in connection with the acts alleged in counts two and three. She asserted that, under *People v. Jacobs, supra*, 78 Cal.App.4th 1444, the People should have

the opportunity to bring in evidence of prior convictions to impeach Little. Defense counsel argued to the contrary.

The court found that the defense had elicited a statement attributed to Little, about coming from church, and that the statement was exculpatory evidence going to counts two and three. Consequently, it allowed one of Little's prior felony convictions to come in under Evidence Code section 1202 for impeachment purposes. Thereafter, the parties stipulated "that on February 27, 2008, the defendant was convicted of a theft-related crime."

Little contends the court abused its discretion in admitting evidence of the prior theft-related conviction. He challenges the soundness of the decision in *People v. Jacobs, supra,* 78 Cal.App.4th 1444 and says the case is not on point in any event.

### (2) People v. Jacobs, supra, *78 Cal.App.4th 1444*

In *People v. Jacobs, supra,* 78 Cal.App.4th 1444, defendant Jarrett Lamont Jacobs was trying to sell stolen equipment out of the trunk of his car. (*Id.* at pp. 1446–1447.) After a deputy sheriff arrived on the scene, Jacobs admitted to her that the car was his, but stated that he had purchased the equipment from a third party. (*Id.* at p. 1447.) Jacobs did not testify at trial. (*Id.* at p. 1449.) Codefendant Maurice Lawson sought the admission of Jacobs's hearsay statement to the sheriff about owning the car. (*Id.* at p. 1446.) Jacobs countered that the entirety of his statement to the sheriff should be admitted, including the portion wherein he stated that he had purchased the equipment from another. The court admitted the full statement. It then granted the prosecution's motion to impeach Jacobs's credibility vis-à-vis his hearsay statement with evidence of certain of his prior felony convictions. (*Id.* at pp. 1446, 1448–1449.) In so doing, the court stated: " 'This is a search for the truth, and . . . when [Jacobs's] statement comes in with regard to his nonculpability in the case, . . . that raises the question of his veracity. And the jury should know at least a reasonable amount with regard to that so that it can draw whatever inferences it intends to draw on that issue.' " (*Id.* at p. 1448.)

■ On appeal, Jacobs argued that the court had erred in admitting the prior conviction evidence for impeachment purposes. (*People v. Jacobs, supra,* 78 Cal.App.4th at p. 1446.) The appellate court held: "In this case of first impression, we determine that a defendant's prior felony convictions are admissible under Evidence Code sections 1202 and 788 to attack his credibility when, at his own request, his exculpatory statement to the police is admitted into evidence, but he does not testify at trial." (*Ibid.,* fn. omitted.)

In the matter before us, Little suggests that *People v. Jacobs, supra,* 78 Cal.App.4th 1444 was wrongly decided. He points out that neither the

California Supreme Court nor this court has opined, in any published decision, as to the correctness of *Jacobs.* We take the bait.

We see no reason to depart from the reasoning of *People v. Jacobs, supra,* 78 Cal.App.4th 1444. As the appellate court in *Jacobs* observed, if Jacobs had chosen to testify, Evidence Code section 788 would have permitted the prosecution to challenge his credibility with prior conviction evidence.[1] (*People v. Jacobs, supra,* 78 Cal.App.4th at p. 1449.) Should he have been allowed to avoid a challenge to his credibility, and undercut the operation of section 788, by the simple device of putting on exculpatory hearsay evidence without taking the witness stand?

Evidence Code section 1202, upon which the *Jacobs* court also relied, closes the door on any such chicanery. Section 1202 provides in pertinent part that "evidence offered to attack or support the credibility of the [hearsay] declarant is admissible if it would have been admissible had the declarant been a witness at the hearing." As the *Jacobs* court concluded, "Taken together, sections 1202 and 788 seem to provide that evidence of prior felony convictions is admissible to attack the credibility of a hearsay declarant." (*People v. Jacobs, supra,* 78 Cal.App.4th at p. 1449.) This reasoning is sound.

If Little had testified, the prosecution could have challenged his credibility with prior conviction evidence under Evidence Code section 788. Instead of testifying, Little sought to bring in exculpatory alibi evidence via a hearsay declaration. Evidence Code section 1202 permitted the prosecution to challenge his credibility with prior conviction evidence, just as it would have been entitled to do if he had taken the witness stand and testified in open court that he was in church at the time of the attempted credit card usage at the Target store.

As a final note, the court in *People v. Jacobs, supra,* 78 Cal.App.4th 1444 offered in dictum another authority that the parties had not raised—article I, section 28 of the California Constitution. (*People v. Jacobs, supra,* 78 Cal.App.4th at pp. 1452–1453.) Article I, section 28, subdivision (f), paragraph (4) of the California Constitution provides in part: "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding." That is plain enough.

True, "[o]ur Supreme Court has determined that subdivision (f) . . . permits introduction of only those prior felony convictions which involve moral

---

[1] Evidence Code section 788 provides in pertinent part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ."

turpitude. [Citation.]" (*People v. Jacobs, supra,* 78 Cal.App.4th at pp. 1452–1453.) However, Little does not suggest that the felony at issue was not a crime of moral turpitude. To the contrary, he maintains that it was a crime of moral turpitude and should have been described as such.

In addition to arguing that *People v. Jacobs, supra,* 78 Cal.App.4th 1444 is not well reasoned, Little argues that *Jacobs* is distinguishable and therefore not controlling. As Little observes, Evidence Code section 356 came into play in *Jacobs,* but is not applicable in the case before us. Section 356 provides in relevant part that whenever a portion of a declaration "is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party . . . ." As applied to *Jacobs,* Lawson sought to put the portion of the hearsay declaration regarding the ownership of the car into evidence. Ostensibly, if the jury knew the car was in Jacobs's possession, it could infer that the stolen equipment was also in Jacobs's possession, and not in Lawson's possession. Jacobs sought to bring the remainder of the hearsay statement into evidence under section 356, to show that while he may have had possession of the equipment, he had purchased it, not stolen it. (*People v. Jacobs, supra,* 78 Cal.App.4th at p. 1451.)

It is true that we have no Evidence Code section 356 issue in the case before us. However, that distinction does not make *People v. Jacobs, supra,* 78 Cal.App.4th 1444 inapposite. Rather, if the impeachment evidence should have been admitted on the facts of *Jacobs,* then a fortiori it should have been admitted in the case before us. The point of *Jacobs* is that if a defendant is going to put his hearsay declaration into evidence, he cannot preclude the prosecution from testing his credibility. One could argue that the decision to put the hearsay declaration in evidence was less voluntary in *Jacobs* than in the case before us. Jacobs's hand was forced. Lawson sought to bring in the hearsay declaration in an effort to save himself and place the blame on Jacobs. Because of Lawson's tactic, Jacobs sought to protect himself by placing the entirety of his hearsay declaration into evidence.

In the matter before us, however, the decision to place the hearsay declaration into evidence was solely the tactic of Little. He was not boxed in by a codefendant. Once Little took it upon himself to put his hearsay declaration in issue, the prosecution was entitled to test his credibility as the hearsay declarant. (*People v. Jacobs, supra,* 78 Cal.App.4th at p. 1446.)

In one final effort, Little contends that the prior conviction evidence should not have been admitted because the prosecution had an alternate remedy. The prosecution simply could have objected to the alibi evidence as inadmissible hearsay. Since the prosecution did not make this objection, Little contends it waived its right to challenge the hearsay declaration by raising a credibility

issue. The only case Little cites for this proposition, *People v. Garceau* (1993) 6 Cal.4th 140, 179 [24 Cal.Rptr.2d 664, 862 P.2d 664], disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166], is inapposite. *Garceau* addressed the issue of whether a party waived a right to claim error on appeal by failing to object on hearsay and relevancy grounds at the trial level. (*People v. Garceau, supra*, 6 Cal.4th at p. 179.) It did not address whether the prosecution must be compelled to make one tactical choice over another at trial.

In short, Little attempted to outmaneuver the prosecution by getting in evidence without testifying. He complains when, in the end, the prosecution outmaneuvered him by selecting the option of presenting prior conviction evidence instead of objecting to the admission of hearsay evidence. What's sauce for the goose is sauce for the gander. Little cites no authority for the proposition that the prosecution can only avail itself of the remedy that favors the defendant.

### (3) *Abuse of discretion*

As the *Jacobs* court observed, our Supreme Court "has stated admission of prior felony convictions is subject to trial court discretion under [Evidence Code] section 352. [Citation.]" (*People v. Jacobs, supra*, 78 Cal.App.4th at p. 1453.) As Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

*People v. Navarez* (1985) 169 Cal.App.3d 936 [215 Cal.Rptr. 519], criticized on a different point in *People v. Warner* (1988) 203 Cal.App.3d 1122, 1129 [250 Cal.Rptr. 462], provides: "The law is now clear a trial court vested with [Evidence Code] section 352 discretion must determine probative value, appraise prejudicial effect, and weigh one against the other. The record must affirmatively show the trial judge did in fact weigh prejudice against the probative value. [Citation.] Further, in permitting impeachment, the trial court must explicitly determine the risk of undue prejudice did not substantially outweigh the probative value. Where a trial court fails to exercise section 352 discretion in the manner required . . . , error occurs." (*People v. Navarez, supra*, 169 Cal.App.3d at p. 948.)

Little argues that the court abused its discretion in failing to either conduct an Evidence Code section 352 analysis or "sanitize" the crime by simply characterizing it as a "crime of moral turpitude." We disagree.

The court announced its ruling that some of Little's prior felony convictions could come in under Evidence Code section 1202 for impeachment

purposes. It then articulated a finding that such prior conviction evidence would be more probative than prejudicial. Little contends the record does not reflect that the court engaged in any weighing process or exercise of discretion. Not so.

Little had five felony convictions and the court asked which ones went to moral turpitude. The court was thus careful to ensure that only crimes of moral turpitude were evaluated for use, not crimes that would be prejudicial but not probative of credibility. It also asked which ones were most recent, not wanting to use any conviction that was stale. This gives an indication that the court was concerned that a stale conviction would not be of probative value. It also limited the number of crimes that could be disclosed to one, even though there were five to choose from. This provides an indication that the court did not want the evidence to be prejudicial.

The court told counsel for the parties that the prior conviction evidence would be admitted either in a manner upon which they agreed, or if they failed to agree, then in a manner the court specified. It gave them an opportunity to work out a stipulation amongst themselves. Again, this shows the court was concerned about the manner in which the evidence was presented, that is, that it not be presented in a prejudicial way. Indeed, the court offered some suggestions as to how the evidence might be character-ized, but left it to their resolution. The court also made clear that it would give the jury a limiting instruction to the effect that the evidence could be considered for credibility purposes only. This shows that the court was concerned that the evidence be presented in a manner that offered probative value, as opposed to prejudicial effect.

Defense counsel asked if the court would consider "sanitizing" the prior conviction by characterizing it as an offense involving "moral turpitude." The prosecutor did not object, but suggested that either the prior conviction "be sanitized to a theft-related felony" or the term "moral turpitude" be defined. The court said that when the only thing that is said is that the defendant was previously convicted of a "crime of moral turpitude," the jury almost always asks what a "crime of moral turpitude" is. Consequently, it suggested admitting evidence of a conviction for a "theft-related crime," but nonetheless left the matter to the agreement of the parties. Both parties agreed to the court's suggestion.

The court thereupon instructed the jury: "[T]hat stipulation, or agreement as to a prior theft-related conviction is only admitted for the purpose of assisting you in determining Mr. Little's credibility. . . . It cannot . . . be

utilized in any other manner. . . ." The court also instructed the jury: "If you find that the defendant has been convicted of a felony, you may consider that fact only in evaluating the credibility of the defendant. The fact of a conviction does not necessarily destroy or impair the defendant's credibility. It is up to you to decide the weight of that fact and whether that fact makes the defendant's statement less believable."

The foregoing exchange on the record shows that the court amply considered the prejudicial effect of prior felony conviction evidence and was concerned about probative value. It also shows that the court engaged in a weighing process in deciding which prior felony conviction evidence to admit and in what manner to admit it.

When defense counsel asked the court to "sanitize" the prior felony conviction evidence by simply calling it an "offense involving moral turpitude," the court did not reject the suggestion out of hand. Rather, it explained that the suggested tactic often resulted in jury confusion. The court, in turn, suggested that the parties come up with a different way of phrasing it to avoid jury confusion. It is clear that the court engaged in a weighing process, that it exercised discretion in suggesting something along the lines of a 2008 conviction for " 'a theft-related crime.' " " 'The record as a whole shows the court was well aware of, and consistently performed, its duty . . . to balance the probative value of evidence against any prejudicial effect.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1187–1188 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

Considerations of balancing aside, we also cannot agree that the failure to "sanitize" a prior theft-related conviction by describing it as a "crime of moral turpitude" is an error. Murder and torture are crimes of moral turpitude. It might be far safer to tell the jury what the crime was than to let the jury speculate.[2]

E. *Ineffective Assistance of Counsel*

■ Finally, Little argues that he received ineffective assistance of counsel in connection with the admission of the prior conviction evidence. "The legal principles relevant to [a] claim [of ineffective assistance of counsel] are well settled. 'To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient in falling below an

---

[2] Because we conclude that the court did not fail to engage in the Evidence Code section 352 weighing process or otherwise abuse its discretion in making its ruling, we need not address Little's harmless error argument.

objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner. [Citations.]' " (*In re Jones* (1996) 13 Cal.4th 552, 561 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

Addressing the first prong, Little emphasizes that when his counsel questioned Hallinan and elicited the hearsay declaration, the issue of the admissibility of prior felony conviction evidence arose. Had his counsel not so inquired of Hallinan, prior felony conviction evidence never would have come into play. Consequently, Little says, his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.

"Our review of counsel's performance is a deferential one. [Citation.]" (*In re Jones, supra*, 13 Cal.4th at p. 561.) " 'A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]' [Citation.]" (*Ibid.*)

Here, defense counsel's action may be viewed as sound trial strategy. Although Little did not testify, his counsel came up with a way to put an alibi before the jury. While the prosecution could have made an objection on the basis of inadmissible hearsay, it did not, and so the jury became aware of the proffered alibi. There was a risk that prior conviction evidence would be presented for impeachment purposes, but then again, the prosecution might not have raised the point. It was a viable tactical strategy. Without the hearsay declaration about church attendance, Little had no alibi.

Little claims that his counsel did not in fact make an informed tactical choice because he admitted to the court that he was unfamiliar with *People v. Jacobs, supra*, 78 Cal.App.4th 1444. However, just because counsel said he was unfamiliar with the case, that does not mean he was also unaware of Evidence Code sections 1202 and 788 and the possibility that the prosecution would seek to admit prior conviction evidence.

Addressing the second prong, Little argues there is a reasonable probability that, but for his counsel's deficient performance, the result would have been more favorable to him. He contends that because the evidence against him was circumstantial, and the jury was asked to make inferences from that circumstantial evidence, the jury was more likely to make negative inferences from the evidence knowing that he had previously been convicted of a theft-related crime. In other words, he says, they were likely to treat the evidence as propensity evidence rather than evidence of moral turpitude bearing upon credibility.

■ This argument disregards the fact that the court instructed the jury that the prior conviction evidence could be used for the purpose of weighing Little's credibility and no other purpose. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 [111 Cal.Rptr.2d 129, 29 P.3d 209].) We presume that the jury did not use the evidence as propensity evidence.

Furthermore, the case against Little was strong. Little was at the open house with Shipman, who then attempted to use Konkol's credit cards at the Target store. It would be hard to avoid finding that either or both of them stole the credit cards. To be more specific, however, Konkol testified that Little and Shipman split up when they entered the house and she could not watch them both at the same time. Shipman was never alone in the house, except when she was in the bathroom. On the other hand, while Shipman and Konkol were upstairs, Little was left alone downstairs, where Konkol had left her purse. The jury could easily conclude that it was Little who lifted Konkol's wallet.

Furthermore, the twosome entered the open house about 1:05 p.m. and the first dispatch concerning the theft went out at 1:42 p.m. The stolen cards were declined at the Target store at 1:51 p.m. At 2:15 p.m., Little and Shipman were detained in fairly close proximity to the Target store, with Konkol's credit cards stuffed between the seats of the truck. The timeframe was pretty tight. Unless Little could come up with a logical alibi for being somewhere other than at the Target store at 1:51 p.m., the circumstantial evidence against him was very strong. We cannot conclude there was a reasonable probability that, but for the introduction of an alibi together with prior conviction evidence, the result would have been more favorable to Little. Little did not receive ineffective assistance of counsel.

## III

## DISPOSITION

The judgment is affirmed.

O'Leary, P. J., and Rylaarsdam, J., concurred.

Appellant's petition for a review by the Supreme Court was denied October 10, 2012, S204351.