Filed 3/18/21  P. Dernigoghossian CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ABRAHAM JOSH DERNIGOGHOSSIAN,<br><br>    Defendant and Appellant. | B304672<br><br>(Los Angeles County Super. Ct. No. BA476675) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Laura R. Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Charles J. Sarosy, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Abraham Dernigoghossian appeals from the judgment following his conviction for cruelty to an animal, with an enhancement for personal use of a dangerous or deadly weapon. Defendant contends the trial court wrongly instructed the jury on the elements of the enhancement, and further erred by allowing the prosecution to impeach defendant with evidence of six prior convictions. We conclude the trial court did not err or, alternatively, any error was harmless. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

We limit our factual summary to the information relevant to the issues on appeal.

### 1. Prosecution evidence

On March 13, 2019, defendant was working as a handyman at a residential property rented by Evelyn Gutierrez and her family. While defendant and Gutierrez chatted in the yard outside the home, Gutierrez's eight-year-old pit bull, Bear, approached and sniffed at defendant. Suddenly, and without provocation, Bear bit defendant on the buttocks. The bite was quick, perhaps two or three seconds, and Bear released defendant on his own. Bear then walked back to his kennel, as he had been trained to do when he misbehaved. Gutierrez's teenage daughter followed Bear and locked the kennel after Bear went in. Defendant cursed and was upset. Gutierrez apologized and told him Bear was vaccinated.

Defendant walked to his truck. Gutierrez assumed defendant was photographing his injury, because while he was at his truck, she received a text from her landlord telling her

2

defendant was bleeding and would need to go to the emergency room.

Defendant returned from his truck with a pocketknife in his hand. He went to Bear's kennel and loudly called for the dog while pounding on the kennel. Bear came out of his doghouse inside the kennel and started to growl and bark. Defendant jabbed at the kennel fence three times with his pocketknife. Then he said to Gutierrez, "Now your fucking dog is going to die," and walked away. Gutierrez called 911 and asked defendant to remain, but he left.

Bear was bleeding profusely. It took several hours before he would come out of his doghouse so Gutierrez could take him to the veterinarian. The veterinarian testified that Bear had a single injury, a one-inch laceration on the side of his face. The wound was deep and had penetrated through skin and muscle. The veterinarian estimated Bear had lost 25 to 30 percent of his blood volume. Bear survived.

A police officer and an animal control officer both testified they saw blood inside the kennel but none outside.

### 2.    Defense evidence

Defendant testified that he saw Bear circling him and Gutierrez as they chatted in her yard. Bear nudged defendant's calf with his nose, then lunged at defendant. Defendant jumped away and avoided the bite. Bear then lunged a second time and bit defendant on the left buttock. Defendant pulled out his pocketknife to defend himself, stabbing at Bear, who let go. Defendant estimated the blade of the knife was four inches long.

Defendant ran to his truck and used his phone to take a video of his injury. He then returned to the kennel and hit it

3

with his hand, asking Bear why he had bitten him.  Defendant did not have his knife in his hand at that point.

Defendant saw that Bear was bleeding.  He said to Gutierrez, "Your dog is about to fucking die."  His intention was to warn her that Bear needed help.

## PROCEDURAL BACKGROUND

An information charged defendant with one count of cruelty to an animal (Pen. Code[1], § 597, subd. (a)), and alleged that in the commission of that offense defendant personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)).  The information further alleged that defendant had suffered six prior convictions for serious and/or violent felonies, subjecting him to enhanced sentencing under the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12), as well as enhancements under section 667, subdivision (a)(1).

The jury found defendant guilty of the animal cruelty charge and further found the weapon allegation true.  On the prosecution's motion, the trial court dismissed three of the six prior conviction allegations, and defendant admitted to the remaining three.

At sentencing, on defendant's motion the trial court struck two of the three prior convictions for purposes of the Three Strikes law.  The trial court selected the high term of three years for the animal cruelty conviction, doubled to six because of the prior strike, and added a one-year weapon-use enhancement and a five-year prior conviction enhancement, for a total of 12 years.  The trial court also awarded credits and imposed fines and fees.

---

[1] Unspecified statutory citations are to the Penal Code.

4

Defendant timely appealed.

## DISCUSSION

## A.     The Trial Court Properly Instructed the Jury on the Weapon Enhancement

Defendant claims the jury instruction for the weapon enhancement under section 12022, subdivision (b)(1) was erroneous.

Section 12022, subdivision (b)(1) provides, "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." In instructing the jury on this enhancement, the trial court used CALJIC No. 17.16, stating, in relevant part, "If you find the defendant guilty of the crime thus charged, you must determine whether the defendant personally used a deadly or dangerous weapon in the commission of that crime. [¶] 'A deadly or dangerous weapon' means any weapon, instrument or object that is capable of being used to inflict great bodily injury or death, and it can be inferred from the evidence, including the attendant circumstances, namely, the time, or place, destination of the possessor, the alteration, if any, of the object from its standard form, and any other relevant fact, that the possessor intended on that occasion to use it as a weapon should the circumstances so require. [¶] The term 'personally used a deadly or dangerous weapon,' as used in this instruction, means the defendant must have intentionally displayed a weapon in a menacing manner or intentionally fired it or intentionally struck or hit an animal with it."

5

Defendant claims that this instruction omitted a necessary element of the enhancement, namely that the alleged weapon not only be *capable* of causing great bodily injury or death, but also be *likely* to cause great bodily injury or death.  He contends the trial court instead should have provided the instruction from CALCRIM No. 3145, defining "a deadly or dangerous weapon" as "any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

The Attorney General argues defendant forfeited this argument by not objecting to the instruction in the trial court. Defendant disagrees.  Because we conclude that even if arguendo the trial court's instruction was erroneous, the error was harmless, we decline to decide the forfeiture issue.

As recently as 2019, our Supreme Court has stated, " ' "In order to find 'true' a section 12022(b) allegation, a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an instrument capable of inflicting great bodily injury or death." ' "  (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 630.)  This statement of the law does not include a requirement that the instrument be likely to cause great bodily injury or death, only that it be "capable" of doing so.  CALJIC No. 17.16 is consistent with the elements of section 12022, subdivision (b)(1) as articulated in *Beck and Cruz*. We acknowledge, however, that beyond stating the elements, *Beck and Cruz* did not analyze the definition of "deadly or dangerous weapon" for purposes of section 12022, subdivision (b)(1).  Rather, the issue in that case was whether the

6

defendant "personally use[d]" the weapon for purposes of the enhancement. (*Beck and Cruz*, at pp. 629–631.)

In arguing that CALJIC No. 17.16 misstates the elements of the enhancement under section 12022, subdivision (b)(1), defendant relies on *In re B.M.* (2018) 6 Cal.5th 528 (*B.M.*) and *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), both of which predate *Beck and Cruz*. *B.M.* addressed the meaning of "deadly weapon" for purposes of section 245, subdivision (a)(1), defining the offense of assault with a deadly weapon. (*B.M.*, at p. 530.) In that context, the Supreme Court emphasized that "for an object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury." (*Ibid.*) Applying that standard, the court concluded there was insufficient evidence of assault with a deadly weapon when the perpetrator used a butter knife to stab at his sister's legs, which were covered with a blanket. (*Id.* at pp. 536–537.)

In addition to being factually dissimilar to the instant case, *B.M.* did not address section 12022, or purport to overrule the precedents on which *Beck and Cruz* relied in stating the elements of the section 12022, subdivision (b)(1) enhancement. Thus, it is not clear to us that the statement of the law in *Beck and Cruz* is inconsistent with *B.M.*

*Aledamat,* unlike *B.M.*, did involve an enhancement under section 12022, subdivision (b)(1), in addition to a conviction for assault with a deadly weapon. (*Aledamat*, *supra*, 8 Cal.5th at p. 6.) The trial court in that case used the instruction from CALCRIM No. 3145, the instruction advocated by defendant in the instant case, which, again, defines " 'a deadly or dangerous

7

weapon' " as one " 'that is inherently dangerous, . . . or one that is used in such a way that it is capable of causing or likely to cause death or great bodily injury.' " (*Aledamat*, at p. 4.)

*Aledamat*, however, did not discuss the significance of the phrase "likely to cause death or great bodily injury," or whether CALCRIM No. 3145 was preferable to CALJIC No. 17.16. Rather, the issue in that case was that the weapon, a box cutter, was not an inherently deadly or dangerous weapon, and the instruction therefore presented an invalid theory under which the jury could find the allegation true. (*Aledamat*, *supra*, 8 Cal.5th at pp. 6–7.) *Aledamat* did not address the authorities upon which *Beck and Cruz* relied, and does not compel the conclusion that the characterization of the elements of section 12022, subdivision (b)(1) in *Beck and Cruz* was deficient.

It therefore is not clear that the trial court erred in instructing the jury using CALJIC No. 17.16, which, again, appears to be consistent with the statement of the law as articulated in *Beck and Cruz*. We, however, need not determine whether CALJIC No. 17.16 remains a valid instruction. Assuming arguendo that section 12022, subdivision (b)(1) requires proof that the instrument was likely to cause great bodily injury or death, any error in omitting that element from the instruction was harmless beyond a reasonable doubt. (*People v. Merritt* (2017) 2 Cal.5th 819, 821, 831 (*Merritt*) [failure to instruct on elements of charged crime harmless if "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error."].)[2]

_____

[2] Defendant argues against applying harmless error analysis, citing concurring or dissenting opinions from justices on the United States and California Supreme Courts. We of course

Instructive is *People v. Stutelberg* (2018) 29 Cal.App.5th 314 (*Stutelberg*).  That case, like *Aledamat*, involved a challenge to CALCRIM No. 3145 in the context of a box cutter and an enhancement under section 12022, subdivision (b)(1). (*Stutelberg*, at p. 317.)  As in *Aledamat*, it was undisputed that a box cutter is not an " 'inherently deadly or dangerous' " weapon under CALCRIM No. 3145, and thus the only valid theory under which the jury could find the enhancement allegation true was that the defendant " 'used' " the box cutter " 'in such a way that it [was] capable of causing and likely to cause death or great bodily injury.' "[3]  (*Stutelberg*, at p. 317.)  Because CALCRIM No. 3145 provided the jury with both the invalid inherently-dangerous theory and the valid dangerous-as-used theory, the instruction was erroneous.  (*Stutelberg*, at p. 317.)

The Court of Appeal concluded the error was harmless beyond a reasonable doubt as to one of the charges to which the enhancement was applied.[4]  (*Stutelberg*, *supra*, 29 Cal.App.5th

---

are bound by the majority opinion in *Merritt*, which endorsed a harmless error analysis in the context of an improper jury instruction.  (*Merritt*, *supra*, 2 Cal.5th at p. 831.)

[3]  Like *Aledamat*, *Stutelberg* did not discuss the significance of the phrase "likely to cause death or great bodily injury," or whether CALCRIM No. 3145 was preferable to CALJIC No. 17.16.

[4]  As noted in *Aledamat*, the *Stutelberg* opinion at one point appears to conflate the "no reasonable doubt" harmless error standard with the more lenient "no reasonable probability" standard applicable to errors of state law.  (*Aledamat*, *supra*, 8 Cal.5th at p. 9, fn. 4; *Stutelberg*, *supra*, 29 Cal.App.5th at p. 322 [concluding "there is no reasonable probability [the jury] would have rejected the deadly weapon enhancement on count 1.

at p. 322.) The evidence showed the defendant sliced or stabbed the back of the victim's head with the box cutter—indeed, the defendant conceded he lacerated the victim but argued he did so in self-defense. (*Id.* at p. 321.) The court stated, "Using a sharp box cutter to stab a victim's head undoubtedly qualifies as using the item 'in such a way that it is capable of causing and likely to cause death or great bodily injury,' " particularly given "the bodily injury that resulted," which soaked the victim's shirt with blood, caused residual nerve damage, and required stitches. (*Id.* at p. 322.) Thus, the court concluded, had the jury not been instructed on the invalid " 'inherently deadly weapon' " theory, but only on the valid " 'deadly or dangerous as used' " theory, it nonetheless would have found the weapon enhancement true. (*Ibid.*)

Just as "[u]sing a sharp box cutter to stab a victim's head undoubtedly qualifies as using the item 'in such a way that it is capable of causing and likely to cause death or great bodily injury' " (*Stutelberg, supra*, 29 Cal.App.5th at p. 322), defendant's undisputed stabbing of Bear in the face with the four-inch blade of his pocketknife, causing a deep wound that bled profusely, also "undoubtedly" meets the test for a deadly or dangerous weapon under CALCRIM No. 3145. Had the trial court given that instruction, as defendant argues it should have, rather than CALJIC 17.16, "it is clear beyond a reasonable doubt that a

---

Therefore, the instructional error was harmless beyond a reasonable doubt."].) Apart from that one instance, the *Stutelberg* opinion otherwise unambiguously applies the stricter "no reasonable doubt" standard, and we conclude that is the standard the court intended to apply.

rational jury would have rendered the same verdict." (*Merritt, supra*, 2 Cal.5th at p. 831.)

Defendant argues the prejudice from the trial court's purportedly erroneous instruction was compounded when the prosecutor, in closing, suggested a pocketknife was an inherently deadly or dangerous weapon by stating, "a knife is, obviously, an example of a deadly or dangerous weapon." Again, to the extent this was error, it was harmless under the reasoning of *Stutelberg*, which unequivocally involved an erroneous instruction of inherent deadliness. Simply put, no rational jury could conclude the pocketknife in the instant case was not dangerous or deadly for purposes of section 12022, subdivision (b)(1), even under the definition endorsed by defendant.

## B. The Trial Court Did Not Abuse its Discretion In Admitting Evidence of Prior Convictions for Purposes of Impeachment

Defendant argues the trial court abused its discretion by allowing the prosecution to impeach defendant with evidence of his prior convictions. We disagree.

### a. *Relevant proceedings below*

Before trial, the prosecution informed the trial court of defendant's prior convictions with which the prosecution intended to impeach him should he testify. The trial court excluded three convictions from 1999 as too remote in time. Over defense counsel's objection, the trial court ruled the prosecution could impeach defendant with six convictions from 2002: residential burglary, felony vandalism, escape by a prisoner in custody, and three counts of carjacking.

11

During cross-examination of defendant at trial, the prosecutor listed the six 2002 convictions by name and defendant confirmed he had suffered those convictions. On redirect, defendant testified that he committed all six offenses on the same day, and they were part of a single case.

In closing argument, defense counsel stated, "Now, we heard that he had a 2002 conviction of six counts, six ugly counts. Are we judging him by this? Is that what we're judging him by, his 18—20-year-old convictions? That's 18 years ago."

In rebuttal, the prosecutor stated, "Now, the defense attorney also says don't judge his client based on his criminal convictions you heard about. I agree. That would be improper. You're not supposed to just judge him on that. But you can consider those convictions in considering his testimony. There's a reason why you were allowed to hear that he suffered those six prior convictions." Shortly thereafter, the prosecutor said, "Now, the defendant got up here under oath and lied to you. Oh, and by the way, those convictions—you all heard what they were—three convictions for carjacking, one for escape from jail, one for first-degree residential burglary, and one felony vandalism."

After closing arguments, the trial court instructed the jury that "[i]n determining the believability of a witness," the jury could consider "the witness's prior conviction of a felony." The trial court further instructed, "The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness."

b.    *Analysis*

Evidence Code section 788 provides, "For the purpose of attacking the credibility of a witness, it may be shown by the

12

examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ." Similarly, Article I, section 28, subdivision (f)(4) of the California Constitution provides in pertinent part that "[a]ny prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment . . . ."

In criminal cases, the felony conviction must involve a crime of moral turpitude, and is subject to the trial court's discretion to exclude the prior conviction under Evidence Code section 352.[5] (*People v. Clark* (2011) 52 Cal.4th 856, 931.) "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify." (*Ibid.*) We review the trial court's ruling regarding the admissibility of a defendant's prior convictions for impeachment purposes for abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)[6]

---

[5] Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[6] Defendant argues we should apply a de novo standard of review, citing *People v. Seijas* (2005) 36 Cal.4th 291. *Seijas* held that an appellate court should review de novo a trial court's ruling concerning a witness's assertion of the privilege against

13

The parties dispute whether defendant preserved this issue for appeal. Again, given our conclusion that the challenge fails on the merits, we decline to address the forfeiture dispute.

Defendant argues that the undue prejudice of introducing evidence of his prior convictions outweighed any probative value. As to undue prejudice, he argues that his prior convictions "involved particularly heinous crimes" of violence that were "similar in nature to the charged offense." He contends that, upon learning of them, the jury would see him "as a violent person, with a violent history," and would therefore conclude he must have committed the charged offense as well. Defendant further contends the prior offenses were too remote in time to be probative of his honesty.

Although we do not intend to diminish the seriousness of defendant's prior offenses, we do not view them as particularly "heinous" compared to other felonies that might be introduced for impeachment purposes. Nor are they similar to the charged offense of animal cruelty, in which the perpetrator "maliciously and intentionally maims, mutilates, tortures, or wounds a living animal." (§ 597, subd. (a).) Although some of defendant's prior crimes, such as carjacking, potentially involve violence or the threat of violence, none of them is a crime the primary intent of which is to harm another living being.

We also disagree that the offenses were too remote in time. As the trial court noted, and defendant does not dispute, defendant was incarcerated for more than 12 years after those 2002 convictions. Thus, defendant cannot be credited with

---

self-incrimination. (*Id.* at p. 304.) That holding has no application here.

14

17 years of crime-free behavior, but only the approximately five years between his release from prison and the instant offense.  Viewed in that light, his prior offenses are not too remote to be probative on the issue of his honesty.[7]

Defendant argues that even if the trial court did not err in admitting some of his prior convictions, the court could have ameliorated the prejudice by admitting only one, or by sanitizing the offenses by prohibiting the prosecution from stating the number of offenses or identifying each offense by name.

We cannot say the trial court unduly prejudiced defendant by not taking these actions.  Defendant was able to clarify for the jury during his testimony that the crimes were all committed on a single day, thus countering any implication that his multiple convictions indicated a long criminal history, and reducing the prejudice that might otherwise arise from the admission of evidence of six prior offenses.  Further, as discussed, the prior offenses were dissimilar from the charged offense and were relatively less heinous, and therefore there would be little benefit in concealing from the jury the nature of those offenses.

Indeed, had the prosecution not informed the jury of the specific offenses, the jury might well have speculated that defendant had committed far more heinous crimes than was actually the case.  In *People v. Little* (2012) 206 Cal.App.4th 1364,

---

[7] Defendant argues there was no evidence he engaged in misconduct in prison, "a particularly hostile environment, ripe with violence, drugs, and theft."  We note there is no evidence in the record one way or the other concerning defendant's conduct while incarcerated.  Regardless, the trial court was within its discretion not to credit defendant for his ability to avoid additional felony convictions while in custody.

the Court of Appeal rejected the argument that the trial court erred by declining to " 'sanitize" a prior theft-related conviction by identifying it only as a 'crime of moral turpitude.' " (*Id.* at p. 1379.) The appellate court explained, "Murder and torture are crimes of moral turpitude. It might be far safer to tell the jury what the crime was than to let the jury speculate." (*Ibid.*) That reasoning applies equally here.

In his reply brief, defendant further argues that admission of evidence of his prior convictions adversely impacted his decision to testify. Given that defendant actually testified, it is unclear how admission of his prior convictions could have adversely impacted the decision to do so. (See *People v. Mendoza* (2000) 78 Cal.App.4th 918, 926–927 [admission of prior convictions cannot adversely impact right to testify when defendant "actually took the stand and suffered impeachment with the priors"].) We certainly accept that the evidence of his prior convictions may have undercut the force of his testimony, but that is the very purpose of impeachment and Evidence Code section 788.

## C. Defendant's Counsel Did Not Render Ineffective Assistance

Defendant argues that to the extent he forfeited his challenges on appeal for failure to object below, he was denied his constitutional right to effective assistance of counsel. To demonstrate ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1406.) As set forth *ante*, defendant has not made this showing and his claim of ineffective assistance of counsel thus fails.

16

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


                              BENDIX, Acting P. J.


We concur:



CHANEY, J.



FEDERMAN, J.*

---

    **\*** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.