Filed 7/11/14  P. v. Estrada CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048059 |
| v. | (Super. Ct. No. 11NF2518) |
| JUAN ESTRADA, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

\*		\*		\*

A jury convicted Juan Estrada, Jr. (Appellant), of five counts (counts 1, 2, and 4 to 6) of engaging in sexual intercourse or sodomy with a child who is 10 years of age or younger (Pen. Code, § 288.7, subd. (a)), one count (count 3) of engaging in oral copulation or sexual penetration with a child who is 10 years of age or younger (*id.*, § 288.7, subd. (b)), and one count (count 7) of committing a lewd act upon a child who is under 14 years of age (*id.*, § 288, subd. (a)). The trial court sentenced Appellant to an aggregate prison term of 73 years to life.

Appellant argues (1) the trial court erred by allowing the prosecution to introduce evidence of his conviction of misdemeanor statutory rape in 1999; (2) the trial court erred by permitting the prosecution to impeach his credibility by asking him about the prior misdemeanor statutory rape conviction; and (3) the errors were cumulative. We conclude the trial court erred by allowing the evidence of the prior misdemeanor statutory rape conviction, but the error was harmless. Appellant forfeited his objections to questions he was asked about the misdemeanor statutory rape conviction, and, because Appellant suffered no prejudice, his ineffective assistance of counsel claim fails. Lastly, we conclude, any cumulative error was harmless. We therefore affirm.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

## I.

### Prosecution Evidence

A. *Appellant's Acts of Sexual Abuse Are Revealed*.

In August 2011, C.E. (Mother) and her husband, Appellant, lived in an apartment with their sons, J. (aged four) and V. (aged two), and Mother's eight-year-old

daughter, S.U. Appellant was not S.U.'s biological father but had been raising her as his daughter since her birth. Appellant and Mother both worked and shared child care duties. Appellant watched the three children during the day and dropped them off at his mother's house on the way to his job. Mother, who worked the day shift at her job, picked up the children at the end of her workday.

On August 17, at about 5:40 p.m., Mother was driving home with the children when S.U. told her "daddy did something to me." When asked what Appellant had done, S.U. said Appellant had put "his thing inside of her" and there was "white stuff" on her leg. After they returned home, Mother spoke by telephone with Appellant, who was at work, and told him, "you're a nasty ass pervert. S[.U.] told me. I am going to have her checked out and let the police handle what they need to handle."

B. *S.U.'s Police Interview*

Mother took S.U. to the La Palma Police Department, where S.U. was interviewed by La Palma Police Officer Juan Guerrero. S.U. told Guerrero that Appellant had placed his "wee-wee" (penis) in her "peaches" (vagina), then turned her around and placed his penis in her "butt." S.U. said there was "white gooey stuff" on her back, in her bottom, and between her legs.

S.U. was taken to a hospital, where Guerrero spoke with her in greater detail about what had happened. S.U. told Guerrero that after waking up that morning, she walked into her parents' bedroom and found Appellant watching girls in bikinis on television. J. and V. were watching with Appellant. When S.U. walked into the room, Appellant turned off the television. She went back to her bedroom. A short time later, Appellant walked into S.U.'s bedroom, undressed her, undressed himself, and put his penis in her vagina, then turned S.U. over, and placed his penis in her anus. Appellant turned S.U. over again and licked her vagina and breasts. S.U. saw white "gooey" stuff on her right leg. S.U. told Guerrero that Appellant had done this "multiple times" since

3

she was six years old.  S.U. previously had told Mother what Appellant had been doing, and she had told him to stop.

Guerrero also interviewed Mother at the hospital.  She said she believed Appellant was capable of sexually abusing S.U. because "I know my husband . . . is a sex freak."  Mother had told Appellant to "get some sex therapy . . . because that seems to be the only thing on your mind."  Starting about a year earlier, Mother had found pornographic DVD's in the home, and had told Appellant, "you're a pervert" and "why [are] you watching that stuff."

C.  *S.U.'s Forensic Sexual Assault Examination*

After speaking with Guerrero at the hospital, S.U. was examined by Patricia Harris, R.N., a forensic sexual assault nurse examiner with the Sexual Abuse Response Team.  During the 35-minute exam, Harris swabbed S.U.'s neck, breasts, navel, genitalia, and buttocks for DNA testing.  Harris observed some bruising on S.U.'s lower legs, a linear abrasion on the top of S.U.'s left foot, and an abrasion on S.U.'s right heel.  Harris found no evidence of any trauma or injuries to S.U.'s anal area.  Harris noted that S.U. had a normal hymenal opening and a second hymenal opening that was probably congenital.  According to Harris, these findings were consistent with the history given because it is more common not to find injuries in cases of child sexual abuse, and only about 5 to 8 percent of such pediatric patients are found to have physical injuries or trauma.  On cross-examination, Harris testified the lack of findings of injury or trauma was also consistent with no penetration.

A low level of amylase, an enzyme found in saliva, was found on the vulva sample and two breast samples in S.U.'s sexual assault examination kit.  The right breast swab contained a mixture indicating a major contributor DNA profile consistent with Appellant and a minor contributor profile consistent with S.U.  The projected frequency of finding a person at random with that major contributor DNA profile was rarer than one

4

in one trillion unrelated individuals. DNA foreign to S.U. was found on the buttocks swab. The male Y profile obtained from the buttocks swab represented a fairly common haplotype found in about one in every 40 unrelated persons. Appellant's profile was one of 216 matches found in the database. Although this was a low number, it supported other evidence that Appellant might have deposited DNA on S.U.

D. *S.U.'s Child Abuse Services Team Interview*

On August 18, 2011, Adrianna Ball conducted a Child Abuse Services Team (CAST) interview of S.U. The 35-minute interview was video recorded and played for the jury. During the interview, S.U. said her parents had been fighting because Appellant had done something bad to her. S.U. again related that Appellant had removed her clothes and his clothes, put his penis on and in her vagina, turned her around, and, after putting his penis in her "butt," was "doing the shaking." Appellant then turned S.U. over, licked her vagina, placed his penis on her chest, and licked her breasts. Between her legs, S.U. had "white stuff," which Appellant wiped off with a towel. He told S.U., "don't tell mommy."

S.U. told Ball this had happened "a lot of times" when S.U. was younger. The first time, when S.U. was six years old, Appellant had pulled down her pants and kissed her "butt cheeks." When S.U. was seven years old, Appellant put his penis in her vagina two or three times while she was sleeping in the living room. S.U. told Ball, "whenever I sleep in the living room my dad always does that stuff to me." When S.U. was eight years old, Appellant placed his penis in her vagina on four occasions and placed his penis in her "butt" about six times. She had always told Mother when Appellant had done something to her, and, when Appellant put his penis in her vagina when she was seven years old, Mother contacted the police. Police officers came to the home, but S.U. did not speak to them, and they did not arrest Appellant.

5

E. *S.U.'s Trial Testimony*

At trial, S.U. testified she remembered talking to a police officer and getting "checked out" by a nurse, but she had lied about everything she told them. Although S.U. had spoken with Mother about the case, Mother never told her to say she had lied. S.U. was afraid of "something happening" if she said that something had happened to her. S.U. denied telling Guerrero or Ball that something had happened to her vagina or breasts and testified Appellant never placed his penis in her vagina or buttocks or licked her breasts or vagina.

S.U. testified she loves Appellant and wants him to come home, but "mom said he can't." Mother had S.U. write a note to Appellant, apologizing for lying about him.[1] S.U. was angry with Appellant because he had ignored her grandmother when she was sick and needed help.

On cross-examination, S.U. testified she is "[m]ostly sad" because her grandmother died and Appellant is in jail. She testified she is "[m]aybe not" afraid Appellant would hurt her if he came home. S.U. did not know what "sex" was and denied ever going into her parents' bedroom when she was not supposed to be there.

F. *Mother's Trial Testimony*

Mother testified that, although she had been physically separated from Appellant since August 17, 2011, she spoke with him almost every day and visited him on the weekends. She denied suggesting to Appellant the best defense strategy would be to make it look as though S.U. was making up a story to get attention. Mother admitted telling Guerrero that she believed Appellant was capable of doing something like this, but claimed she made that statement to get Guerrero "off my back." She had referred to Appellant as a "sex freak" and a "pervert" because sex seemed to be the only thing on his

---

[1] The note states: "Dear Dad . . . [¶] . . . [¶] . . . I'm sorry that I lied. I was mad because you would ignore grandma, and grandma would be calling your name when you were cooking, and that's why I was mad. I wanted you out of the house."

6

mind and, even though they had an active sex life, he watched pornography. She claimed that her statements about Appellant concerned only her personal relationship with him. According to Mother, S.U. had expressed fear that social services would get involved and take her away for lying.

## II.

### Defense Evidence

Maria Cruz Hernandez, Appellant's mother, testified she used to babysit S.U., J., and V. Hernandez testified S.U. was a good girl but sometimes did not tell the truth. Hernandez sometimes scolded S.U. for looking at nude people on the computer but never informed Mother about this because Hernandez did not think it was important.

Mother, who was recalled as a defense witness, testified S.U. was curious about sex and there had been times when she and Appellant caught her in their bedroom when they were having sex. Mother typically checked the home computer's Internet history after returning home from work and therefore knew S.U. had visited adult YouTube sites. Although Mother claimed that S.U. had always visited adult Web sites, Mother does not believe in counseling. Mother was helping to finance Appellant's defense and had a "vested interest" in getting him out of jail.

Mother was aware of Appellant's prior statutory rape conviction and had met the victim. When Mother was dating S.U.'s biological father, they double-dated with Appellant and the victim, who was 17 or 18 years old. Appellant was 22 or 23 years old when he was convicted.

Appellant testified that on the morning of August 17, 2011, he was playing and wrestling with J. and V. in Appellant's bedroom and S.U. wanted to join in. S.U. left the room and returned wearing only a shirt and underwear. When Appellant realized S.U. was not wearing pants, he sent her back to her room because "she is not allowed to be like that with the boys."

7

After playing with the children, Appellant showered to get ready for work. He asked S.U. to bring him a towel. She brought him a dirty towel, so he asked her to go back and bring him a clean one. S.U. returned quickly with the towel and opened the bathroom door. Appellant said, "baby, I'm naked," grabbed the towel from S.U., and closed the door. S.U. giggled.

Later that day, while at work, Appellant received a telephone call from Mother. It was very noisy, and he was able to hear only parts of what she was saying. Appellant called her back and understood why she was angry.

On cross-examination, Appellant admitted that when he was 23 years old, he had been convicted of misdemeanor statutory rape.

## DISCUSSION

## I.

### Evidence of Appellant's Prior Misdemeanor Statutory Rape Conviction Was Harmless.

Appellant argues the trial court abused its discretion under Evidence Code section 352 and violated his constitutional rights by allowing the prosecution to use evidence of his 1999 misdemeanor statutory rape conviction.

A. *Background*

In the People's trial brief, the prosecution asserted Appellant had pleaded nolo contendere to a charge of violating Penal Code section 261.5 (misdemeanor statutory rape) for acts that occurred between February 1 and September 4, 1998. The prosecution argued evidence of this prior crime was relevant and admissible under Evidence Code section 1108. The only evidence of the prior crime was the fact of the conviction; there was no evidence of the substance of the charges.

At the outset of trial, Appellant's trial counsel objected to the prior crime evidence on the grounds of remoteness in time and lack of similarity with the offenses to

8

be tried. The trial court denied the prosecution's request to admit evidence of the misdemeanor statutory rape conviction because "we know nothing about the case[,] . . . [w]e don't know what was involved." In deferring a decision on use of the evidence for impeachment, the court stated: "[S]hould [Appellant] determine he wants to testify, then we can talk about at that point is the door wide open, is it partially opened. That depends on what kind of questions are being asked and what kind of answers are being given on cross-examination. So we'll deal with that if and when that issue comes up."

During trial, the videotape of S.U.'s CAST interview was played for the jury. During the interview, S.U. had said Appellant did some "bad things" to her when she was younger, and, after one incident when S.U. was seven years old, Mother called the police, who came to their home.

Defense counsel cross-examined Guerrero about whether he had found a police report concerning the prior instance mentioned by S.U., in which Mother had called the police. Defense counsel first asked Guerrero to confirm that "[a]s you saw in the video, S[.U.] said her mother called the police when she was seven." Counsel next asked Guerrero whether "anyone in your department" had searched for a police report. Guerrero responded, "[i]n house." When asked whether there were any other police reports related to S.U., Mother, or Appellant, Guerrero testified: "I don't believe so, no. [¶] . . . [¶] In house with us, no."

This exchange took place on redirect examination of Guerrero:

"Q. [(The prosecutor)] You said that you searched for police reports with regard to Juan Estrada?

"A. [(Guerrero)] Correct.

"Q. And you found nothing in house?

"A. Correct.

"Q. Did you find anything else outside?

"A. Outside we found—

9

"[Defense Counsel]:  Objection."

In a following sidebar conference, defense counsel argued the statutory rape charge was inadmissible because its probative value was outweighed by its risk of prejudice.  The prosecutor argued defense counsel "opened the door" by asking Guerrero whether he had looked for any reports regarding S.U. or Appellant.  The trial court agreed that defense counsel had "opened the door" but asked whether the statutory rape conviction was relevant.  The prosecutor argued:  "Right now the inference is that there is no criminal record that the detectives have located, there [were] no complaints that were filed, that S[.U.] is making all of this up.  And the detective is responding, 'I looked in house, didn't find anything, but I went outside and I found this conviction for statutory rape.'"  The court asked, "[s]o this is going to his credibility?"  The prosecutor answered, "[c]orrect."

Acknowledging "it is a difficult situation," the trial court stated:  "It's now strictly a credibility issue.  We need to be very clear.  [¶]  This is not a propensity issue that you're going after; is that correct?"  The prosecutor answered, "[c]orrect."

After redirect examination of Guerrero resumed, he testified he found information that Appellant had been arrested "in his early 20[']s regarding possible child molestation or of that nature."  The next day, Guerrero was recalled, and he corrected his testimony to state Appellant had been convicted of statutory rape.  He identified a certified copy of the misdemeanor complaint filed in 1998 and the court minutes from that case reflecting Appellant had pleaded nolo contendere to the charges in February 1999.  The court instructed the jury it could consider the evidence of the misdemeanor statutory rape conviction "for the limited purpose of the defendant's credibility, but not as to propensity to commit the acts for which he's charged in this action."  The court wanted "to be sure everybody is very, very clear on that."  The misdemeanor complaint and the court minutes were received in evidence as exhibit No. 13.

10

B.  *The Prior Conviction Evidence Was Inadmissible.*

Appellant argues evidence regarding his misdemeanor statutory rape conviction was irrelevant and was inadmissible as propensity evidence, to attack his credibility, or to attack his character.  At trial, the prosecutor stated and then confirmed the evidence of Appellant's prior misdemeanor rape conviction was not being offered as propensity evidence under Evidence Code section 1108, subdivision (a), and the trial court specifically instructed the jury it could not consider Appellant's prior conviction for that purpose.  On appeal, the Attorney General does not argue the misdemeanor statutory rape conviction was admissible under section 1108, subdivision (a).

Evidence of a prior conviction may be used to attack a criminal defendant's credibility, but only once the defendant has testified or the defendant's exculpatory statements have been admitted at the defendant's request.  (Evid. Code, §§ 1202, 788; *People v. Little* (2012) 206 Cal.App.4th 1364, 1374.)  When evidence of Appellant's 1999 misdemeanor statutory rape conviction was admitted during Guerrero's testimony, Appellant had neither testified nor requested admission of any exculpatory statement.

The Attorney General argues the trial court really meant to say the prior conviction evidence was admissible as character evidence and misspoke by using the word "credibility."  The trial court went to great pains, however, to explain the conviction evidence was admissible only for credibility purposes, twice had the prosecutor confirm "this is going to his credibility," and instructed the jury the evidence was admissible only "for the limited purpose of the defendant's credibility."

Even if the Attorney General has correctly discerned the trial court's intent, evidence of Appellant's prior conviction for misdemeanor statutory rape was nonetheless inadmissible as character evidence.  The prosecution may present relevant evidence of a defendant's character, but only to rebut evidence offered by the defendant placing his or

11

her character in issue. (Evid. Code, § 1102, subd. (b).)[2] The prosecution is limited to evidence in the form of an opinion or reputation evidence. (*People v. Felix* (1999) 70 Cal.App.4th 426, 431.) The prosecution may not use evidence of specific instances of conduct, which includes evidence of a prior conviction. (*Ibid.*)

The Attorney General argues, "[t]he trial court properly admitted evidence of appellant's statutory rape conviction as evidence of appellant's character after he opened the door by suggesting that he had never been arrested for a sex crime." This argument misconstrues the context in which the matter of the misdemeanor statutory rape conviction arose. The jury had just watched the recording of S.U.'s CAST interview in which S.U. said that Mother had called the police after one incident of sexual abuse and that police officers had come to the house. Defense counsel asked Guerrero whether anyone in his department had searched for a police report of that incident. By asking that question, defense counsel did not place Appellant's character in issue because the purpose of the question was to test the veracity of S.U.'s statement that Mother had called the police on that one occasion. Moreover, even if Appellant had placed his character in issue, the prosecution was limited to presenting evidence "in the form of an opinion or evidence of [Appellant's] reputation" (Evid. Code, § 1102) and could not present evidence of specific instances of conduct, including prior criminal convictions (*People v. Felix*, *supra*, 70 Cal.App.4th at p. 431).

C. *Harmless Error*

Error in the admission of prior conviction evidence is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v.*

---

[2] Evidence Code section 1102 states in full: "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character. [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."

*Anderson* (1987) 43 Cal.3d 1104, 1137.) Under the *Watson* standard, "[t]he reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) In applying this standard, we examine "'the entire cause, including the evidence.'" (*Watson*, *supra*, at p. 836.)

The jury was presented with the videotape of S.U.'s CAST interview, in which S.U. described in detail the things Appellant did to her on August 17, 2011 and had periodically done to her since she was six years old. S.U.'s statements in the CAST interview were consistent with what she had twice told Guerrero the previous day. Appellant's DNA was found on S.U.'s chest, and DNA foreign to S.U. was found on the buttocks swab. The male Y profile obtained from the buttocks swab represented a fairly common haplotype found in about one in every 40 unrelated persons. Appellant's profile was one of 216 matches found in the database. Guerrero testified that, at the hospital, Mother had told him she believed Appellant was capable of sexually abusing S.U. because "I know my husband . . . is a sex freak."

Appellant describes this case as "largely dependent on an assessment of witness credibility" and admission of evidence of Appellant's misdemeanor statutory rape conviction thus likely led the jury to disbelieve his testimony and other defense evidence. In response to S.U.'s allegations, Appellant offered a patently incredible story suggesting that his DNA got on S.U.'s chest while the two were wrestling and that S.U. was an eight-year-old voyeur who giggled when seeing him get out of the shower naked. All three defense witnesses, including Appellant, were biased and presented the classic strategy of protecting the husband and son by accusing the child of lying. Mother backpedaled in several different directions to try to explain away her damaging statements to Guerrero, while both Mother and Hernandez, Appellant's mother, wanted the jury to believe S.U. looked at naked people on the computer and had always done so.

13

At trial, S.U. tried to recant her CAST interview statements and statements made to Guerrero by claiming she had lied about everything. As the trial court aptly noted at sentencing, "[a]fter watching the CAST interview, as well as . . . the comments made by S[.U.] to her mother, and the mother's subsequent recorded statements to the police, which were incredibly telling by themselves, and then watching this child fabricate statements in court, and seeing her discomfort in doing this, reaches the realm of the unthinkable."

The misdemeanor complaint in the statutory rape case alleged the victim was under the age of 16. Mother testified, however, the victim was 17 or 18 years old. Based on this testimony, the jury might have believed that the facts underlying that case did not involve a child under the age of 16, as alleged in the misdemeanor complaint, and about four to six years separated Appellant from the victim, who were dating at the time.

Credibility was indeed an important issue for the jury to resolve in order to reach a verdict in this case. While we, of course, cannot weigh the evidence or judge credibility, we can say, based on an examination of the entire record, it is not reasonably probable the jury would have resolved any credibility issues differently and reached a different verdict if it had not learned of Appellant's misdemeanor statutory rape conviction.

Appellant argues the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, applies because the prior conviction evidence violated his due process rights to a fundamentally fair trial. We disagree. "To prove a deprivation of federal due process rights, [Appellant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is

14

. . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.)  In this case, the trial court's error did not even come close to meeting that standard.

## II.

### Appellant Forfeited Objections to His Impeachment with the Misdemeanor Statutory Rape Conviction, and His Ineffective Assistance of Counsel Claim Fails.

Appellant argues the trial court erred by permitting the prosecutor to ask him whether he had a "1998 conviction" for statutory rape.  "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.)  While evidence of conduct underlying a criminal conviction is admissible in the trial court's discretion, the bare fact of the conviction is inadmissible hearsay when offered to impeach a witness's credibility.  (*People v. Chatman* (2006) 38 Cal.4th 344, 373.)  Asking a witness whether he or she has suffered a prior criminal conviction, as opposed to asking whether the witness committed the conduct underlying the conviction, calls for inadmissible hearsay. (*People v. Wheeler* (1992) 4 Cal.4th 284, 298-299.)

When the prosecutor asked Appellant about his statutory rape conviction, his trial counsel objected only on the ground the question was beyond the scope of direct examination.  Appellant thereby forfeited all other objections,[3] including the objection

---

[3] There is a difference of opinion among appellate courts over the extent to which statutory rape is a crime of moral turpitude.  (Compare *People v. Fulcher* (1987) 194 Cal.App.3d 749, 754 [statutory rape is necessarily a crime involving moral turpitude] with *People v. Flanagan* (1986) 185 Cal.App.3d 764, 772-773 [statutory rape does not necessarily involve moral turpitude] and *Quintero-Salazar v. Keisler* (2007) 506 F.3d 688, 693-694 [statutory rape is conduct that is malum prohibitum and therefore is not categorically a crime of moral turpitude].)  We do not need to address this issue.

that the conviction itself was hearsay.  (*People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1515.)

Appellant also raises an ineffective assistance of counsel claim.  To prevail on a claim of ineffective assistance of counsel, the defendant must prove (1) the attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards; and (2) the attorney's deficient representation subjected the defendant to prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Cain* (1995) 10 Cal.4th 1, 28.)  Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, *supra*, at p. 694.)

We do not address whether counsel's representation was deficient because we conclude Appellant suffered no prejudice.  (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697 ["a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies"].)  As we explained in part I. of the Discussion section, admission of evidence regarding Appellant's misdemeanor statutory rape conviction did not result in prejudice under the *Watson* standard.  Because Appellant testified he was 23 years old at the time of the conviction, and Mother's testimony indicated the victim was four to six years younger than he was, the jury likely did not infer from the statutory rape conviction that Appellant had the propensity to sexually abuse children.  For all of these reasons, there was no reasonable probability that, but for trial counsel's failure to object to the question regarding the statutory rape conviction, the jury would have reached a different result.

## III.

### Any Cumulative Error Was Harmless.

Appellant argues the cumulative effect of the errors requires reversal.  In analyzing a claim of prejudicial error, we ask whether a "'series of trial errors, though

16

independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'"  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  Because Appellant's trial counsel did not make the appropriate objections to questions regarding the prior misdemeanor statutory rape conviction, the only error made by the trial court was allowing other testimony and evidence on that subject.  Nonetheless, assuming there were multiple errors, "we would not say the whole of the trial court's errors outweighed the sum of their parts (*People v. Roberts* (1992) 2 Cal.4th 271, 326 . . . ), a result more favorable to [Appellant] would have been reached in the absence of the errors (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1237 . . . ), or [Appellant] suffered a miscarriage of justice (*People v. Hill*[ (1998)] 17 Cal.4th [800, ]844)."  (*People v. Najera* (2006) 138 Cal.App.4th 212, 228-229.)


### DISPOSITION

The judgment is affirmed.



FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.


17