Filed 8/12/16  P. v. Coulter CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>TIMOTHY LEO COULTER et al.,<br><br>　　　Defendants and Appellants. | F068396<br><br>(Tuolumne Super. Ct.<br>Nos. CRF41594 & CRF41596)<br><br>**OPINION** |

-ooOoo-

APPEAL from judgments of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Timothy Leo Coulter.

Kelly Lynn Babineau, under appointment by the Court of Appeal, for Defendant and Appellant Mitchell Collison Troupe.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendants Timothy Leo Coulter (Coulter), Mitchell Collison Troupe (Troupe), and Susanna Ferreira (Ferreira) were jointly tried and convicted by a jury of multiple felonies based on commercial burglary and intent to steal from Walmart in Sonora.

Coulter and Troupe have filed separate appeals in this consolidated case; Ferreira is not part of this appeal.

Coulter contends the court erroneously permitted the prosecutor to introduce evidence of his prior theft-related convictions to impeach his exculpatory hearsay statements.

Troupe contends the court erroneously admitted Ferreira's pretrial statements in violation of *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). We affirm.

## FACTS

### Coulter and the fishing poles

On July 2, 2013, video surveillance cameras at Walmart in Sonora showed Coulter enter the store through the garden center doors around 5:30 p.m. He walked through the store, went through various aisles, and arrived at the back corner of the sporting goods department. Coulter selected two fishing poles and walked away from the display.

Melissa Dobbs (Dobbs), the store's plainclothes asset protection agent, watched Coulter walk through the store with two fishing poles. Coulter approached the front registers, then turned in another direction and walked through more aisles.

Dobbs followed Coulter as he walked back to the store's garden center. Coulter was still carrying the two poles, each of which cost "in the hundreds." Coulter looked at the merchandise on the garden center's patio. The patio was surrounded by a chain link fence, with slats through the links. The bottom of the fence line ended about three inches from the ground. The parking lot was on the other side of the fence.

Dobbs watched as Coulter bent down, placed the two fishing poles on the ground, and slid them under the patio fence. The fishing poles were perpendicular to the fence so that they were "halfway sticking out … onto the sidewalk on the outside of the store, [and] halfway in the store." Coulter walked out of the store through the garden center's doors and went into the parking lot. He was no longer carrying the fishing poles.

Dobbs quickly retrieved the two fishing poles to make sure Coulter did not "go around and pull them through the fence." Dobbs took the fishing poles to her office in the customer service department. As she left her office, she noticed a woman, later identified as Ferreira, standing at the customer service counter.

**Troupe, Ferreira, and the air conditioner**

In the meantime, Walmart's video surveillance cameras showed that Troupe and Ferreira were also walking around Walmart. William Pruett (Pruett), the store's asset protection manager, testified the surveillance video showed Ferreira pushing a shopping cart in the hardware department. Troupe was walking behind her with his own cart. Ferreira entered the aisle where air conditioners were displayed. Pruett testified that Ferreira selected an air conditioner that was in a box, and put it in her shopping cart.

Ferreira walked around the store and through various departments while pushing the cart with the air conditioner. Troupe followed some distance behind her. They split up and walked around different departments. They appeared to rejoin each other, and walked to the front of the store.

Pruett testified Ferreira continued to push the shopping cart with the air conditioner, and Troupe followed behind her. They walked past the cash registers and went to the customer service counter, where merchandise returns are processed. Ferreira sat down on a bench and the cart was next to her.

**Ferreira and Coulter meet outside the store**

At 6:05 p.m., Ferreira left the store, leaving the shopping cart and air conditioner inside.

3.

At about the same time, Pruett went outside the store for his break. Dobbs went with him and told him about the fishing poles. Dobbs saw Coulter in the parking lot, pointed him out to Pruett, and said he was involved with the fishing poles. Dobbs went back inside the store while Pruett stayed outside. Pruett noticed Coulter was talking to a woman in front of the store, and Pruett called Dobbs. Dobbs said that same woman was trying to return an air conditioner.

At 6:06 p.m., Ferreira walked back into the store and sat in the waiting area in the customer service department. She sat next to the shopping cart with the air conditioner.

At 6:09 p.m., Troupe appeared in the customer service department and spoke to a clerk at the counter. Pruett testified that Troupe appeared as if he was going to return something.

At 6:11 p.m., Troupe left customer service and walked out of the store through the "cart rail" doors, which are used to push carts back into the building. Ferreira remained in the customer service department, with the air conditioner in her shopping cart.

At 6:15 p.m., Coulter walked into the store using the exit doors and went to the customer service department. Coulter spoke to Ferreira, who was still sitting in the waiting area with the air conditioner in her cart. After talking to Ferreira, Coulter walked out using the main doors.

At 6:18 p.m., Ferreira briefly spoke to a clerk at the customer service counter. Troupe entered the store through the main doors, arrived in the customer service department, and stood in Ferreira's vicinity. Troupe spoke to the store's assistant manager. At 6:22 p.m., Troupe walked toward the store's main entrance, but turned around and left the store through the cart rail doors.

Ferreira was still in the customer service department. She stood up from the bench and pushed her shopping cart along the counter. The air conditioner was still in the cart.

**Troupe places the air conditioner on the customer service counter**

At 6:27 p.m., Troupe returned to the store and rejoined Ferreira in the customer service department. Pruett testified that Troupe moved the air conditioner from Ferreira's shopping cart and placed it on the customer service counter. Based on his observations from the store's surveillance cameras, Pruett believed Troupe's actions were consistent with trying to return merchandise.

Both Troupe and Ferreira stood at the counter. No one presented a receipt for the air conditioner. Troupe did not sign anything.

At 6:30 p.m., Troupe left the store using the cart rail doors. Ferreira remained at the counter.

At 6:31 p.m., the customer service clerk processed the return of the air conditioner. Ferreira signed the return receipt for approximately $269.00 plus tax, and returned the paperwork to the clerk.

**Ferreira flees from the store**

Pruett decided that a fraudulent return had been made using store merchandise.

Pruett and Dobbs approached Ferreira after she signed the receipt and returned it to the clerk, and before she received any money. Dobbs asked to speak to Ferreira about " 'the fraudulent return that you just did.' " Ferreira said: " 'I don't know what you are talking about. I didn't do this. I'm just doing it for someone else.' " Ferreira also said, " 'I'm not the one returning the air conditioner. It was Mr. Troupe that was returning it,' " and that was why she used his identification.

Pruett asked Ferreira to remain in the store. Both Pruett and Dobbs stood in front of Ferreira and blocked her path to the main door.

At 6:32 p.m., Ferreira pushed past them and headed to the door. Ferreira knocked the store's automatic front door off its tracks and ran outside. Pruett and Dobbs went after her. As she fled, Ferreira said, " 'I didn't do that. Leave me alone. I did nothing wrong.' " Pruett called the police.

## Defendants escape in Troupe's car

The store's surveillance cameras showed that as Ferreira completed the return transaction, a black Volkswagen Cabrio open-top convertible stopped in the parking lot near the store's main doors. Troupe was in the driver's seat and Coulter was standing outside the car.

When Ferreira ran out of the store, she went to the car and Coulter opened the door for her. Coulter and Ferreira got into the car, and Ferreira repeatedly yelled, " 'Go, go, go.' " Troupe drove away. As the car left the parking lot, the convertible top was closed.

## Apprehension of defendants

Sonora Police Officer Andrew Theodore responded to a dispatch of a possible robbery and attempted theft at Walmart, with a description of the suspects' car and license plate number. Within minutes of the dispatch, Theodore saw the car traveling toward the onramp to Highway 108. Troupe was driving at a high rate of speed. Theodore testified all three occupants looked directly at his patrol car. Theodore activated his patrol car's lights and tried to conduct a traffic stop. Troupe failed to stop, and continued at a high rate of speed. Theodore followed at approximately 70 to 80 miles per hour.

After about a quarter mile, Troupe pulled over and stopped. Coulter and Ferreira were his passengers. Officer Theodore requested backup assistance to detain the three suspects, and then he separately questioned each person.

At trial, Officer Theodore testified without objection about the statements made by Ferreira, Coulter, and Troupe about their actions at Walmart.

## Ferreira's statements

Officer Theodore testified he talked to Ferreira first, and he asked if she had been inside Walmart. Ferreira said yes. Ferreira explained they were from Modesto, and Coulter was her boyfriend. Ferreira said she was at Walmart because Troupe wanted her

6.

to return an air conditioner for him. Ferreira initially said the air conditioner had been in the car with them. As the interview continued, Ferreira said there was something in the car, but she did not know what it was. Ferreira eventually said there was only one air conditioner.[1]

Ferreira said she went into the store without the air conditioner. A short time later, Troupe walked in with the air conditioner. Troupe asked her to return the air conditioner. Ferreira said no because she had too many returns in a short period of time at Walmart, and her name had been flagged. Ferreira said she did not return the air conditioner and she did not sign any documents.

Ferreira said that Troupe attempted to return the air conditioner and then left the store. Ferreira said the loss prevention officers talked to her, and she told them she was not involved. She left the store to get Troupe so he could handle it. Ferreira denied that she told Troupe to "go" when she got into his car.

**Coulter's statements**

Officer Theodore asked Coulter if he had been at Walmart. Coulter said no. Theodore told Coulter that he had been seen on the store's video surveillance cameras. Coulter then admitted he went there with Troupe and Ferreira. Coulter said he grabbed some fishing poles, and left them alongside the garden center's fence because he realized that he did not have his wallet. Officer Theodore asked Coulter if he slid the fishing poles under the fence. Coulter said no.

Officer Theodore asked Coulter about the air conditioner. He said he did not know anything about it.

Coulter did not testify at trial. His exculpatory hearsay statement to Officer Theodore – that he left the fishing poles on the ground because he forgot his wallet – was

---

[1] In issue II, *post*, we will address Troupe's contention that the admission of Officer Theodore's testimony about Ferreira's statements violated his Sixth Amendment right to confront and cross-examine witnesses under *Aranda/Bruton*.

7.

impeached by evidence that Coulter had two prior convictions for receiving stolen property in 2010 and 2013.[2]

**Troupe's statements**

Officer Theodore asked Troupe if he had been at Walmart. Troupe said they had been at Chicken Ranch Casino. They were headed to Black Oak Casino when Ferreira received a call from an unknown person, who asked her to return an air conditioner. Troupe said the unknown person was supposed to bring the air conditioner to Walmart for Ferreira to return.

Troupe never said an air conditioner was in his car, he walked into the store with an air conditioner, or that he put the air conditioner in Ferreira's shopping cart.

Troupe said he let Ferreira use his identification to return the air conditioner because her name was flagged in the system for making too many returns. Troupe said that Ferreira left the store, yelled for him, ran to the car, and told him to go. Troupe said he quickly drove away.

Officer Theodore advised Troupe that he was going to look at the store's surveillance videotape. Troupe replied that "what he told me would be exactly what I would observe in the video footage."

Officer Theodore testified he looked at Ferreira's cell phone and did not find any corresponding incoming call. Theodore called Pruett at the store and learned about the sequence of events shown on the surveillance videotape.

Officer Theodore testified he returned to Troupe and again asked about what happened at the store. Troupe said he entered the store separately from Ferreira. Troupe said that "he was under the assumption somebody was to bring the air conditioner to her to return it." Troupe said he approached Ferreira at the customer service area and asked

---

[2] In issue I, *post*, we will address Coulter's contention that the court abused its discretion when it granted the prosecution's motion to introduce his prior convictions to impeach his exculpatory hearsay statement to Officer Theodore.

8.

"if she had the return." Ferreira replied, " 'It's right here,' referring to the air conditioner." Troupe never said he put that particular air conditioner in Ferreira's shopping cart.

Officer Theodore asked Troupe how the air conditioner came into play. Troupe said that "he placed an air conditioner inside of the cart, but did not believe that that air conditioner had any relation to the air conditioner that they were there to do the return for," and that it was a completely different air conditioner. Theodore asked Troupe how many air conditioners he saw. Troupe said he just saw one. Troupe did not explain why he thought there was a different air conditioner.

Theodore again asked Troupe about leaving the store in a hurry. Troupe said Ferreira ran out of the store, and he quickly drove away because he was scared.

<strong><u>DEFENSE EVIDENCE</u></strong>

Coulter and Ferreira did not testify at trial or introduce any evidence.

At trial, Troupe testified he was with Ferreira and Coulter, and they drove to Chicken Ranch Casino. They stayed there for about one hour. Troupe believed Ferreira received a telephone call. Troupe initially testified he was not present during the call and did not hear the conversation. On cross-examination, Troupe admitted that when they were still at the casino, he knew they were going to Walmart so Ferreira could return something for someone, and an air conditioner was mentioned. As a result of the call, they left the casino, and he drove them to Walmart in his Volkswagen convertible.

Troupe testified Ferreira was going to give him $50 for driving her to Walmart to return an air conditioner for a friend. Troupe was out of cash and agreed. Troupe admitted the air conditioner was not in his car, and he did not know where it was. Troupe could not recall if Coulter talked to him about fishing poles before they arrived at Walmart.

Troupe testified they arrived at Walmart and he parked the car. Ferreira went into the store while Troupe stayed in the car because it was supposed to be a quick stop.

9.

Troupe initially testified that he could not remember whether Coulter stayed in the car or went into the store. After being shown the store's surveillance video, Troupe conceded that Coulter went into the store.

After waiting for five to 10 minutes, Troupe went in the store. He thought he grabbed a shopping cart when he went in. Troupe walked around the electronics department, "killing time," and looking at television sets.

Ferreira saw Troupe and waved him over. Ferreira asked Troupe to go to a particular section of the store. She asked him to lift an air conditioner from a store shelf and put it in her shopping cart, and he did.[3]

Troupe testified that he thought Ferreira was going to return something else, and "it could have been an iPod touch in her purse," or it "could have been anything." Troupe testified that he only saw one air conditioner in Ferreira's cart, but "I didn't see her friends" who had called her about making a return. Troupe testified he knew the unit in the shopping cart was not the air conditioner that she was going to return.

Ferreira pushed her cart with the air conditioner and walked all around the store. Troupe followed behind her and pushed his own cart. Troupe became impatient because he needed to get home.

Troupe testified that Ferreira asked if he had recently made any returns to Walmart. Troupe said he did not know, but they could check. Troupe left his shopping cart in an aisle; he admitted there were items in his cart, but he did not buy anything, and he left the items there. Troupe believed he left the store, went to his car, and retrieved his driver's license. He gave his driver's license to Ferreira to check on the returns.

Troupe testified they walked past the cash registers and went to the customer service department. He wanted to check if he could make a return for Ferreira, but he did

---

[3] Pruett, the store's asset protection manager, testified that the videotape showed Ferreira put the air conditioner into her shopping cart.

not know what she was going to return. Troupe also testified Ferreira asked him to read the specifications on the box for the air conditioner. Troupe asked an employee some questions about the air conditioner.

Troupe testified he asked a customer service clerk how they could tell "if you have a return." The clerk said he had to have an item. Troupe said he had an item and asked if it would work. The clerk said yes. Troupe put the air conditioner on the counter so they could check to see if he could do a return. Troupe explained:

> "[T]he only way that they could check to see if I had a return on my license was to find out through an item. That item was in the cart. That is why I put it up there. That is the only reason why I put it up there. I had no idea what the transaction was going to be, you know, as far as her buying something or she had something to return other than that air conditioner unit. I didn't ask."

Troupe testified Ferreira was sitting in the waiting area while the clerk checked if he could make a return.

Troupe could not recall whether Ferreira left the store. Troupe told Ferreira he could make a return. He went back to his car because he did not have any other business in the store. Coulter was waiting in his car.

Troupe testified he waited for several minutes, then returned to the store and told Ferreira to hurry because he needed to get home. Troupe went back to the car to wait. After about five minutes, Troupe again went into the store to see what was taking so long. Troupe testified he asked the customer service manager if there were any issues with the return. The clerk said no, and Troupe left. He did not pay attention to whether he left through the cart return. Troupe testified he never intended to steal from Walmart.

Troupe testified he moved his car from the parking space, to the front of the store's entrance because he knew the air conditioner was heavy. He told Coulter to go inside and get Ferreira. He did not leave the engine running while he waited for them. Coulter returned without Ferreira, and Troupe became upset.

11.

Troupe testified Ferreira ran out of the store, and she was yelling that they thought she stole the air conditioner.  Troupe started his car, Ferreira got in, and he drove away.  Ferreira again said they thought she stole the air conditioner.  Troupe turned the car around and intended to return to the store to straighten things out.  Troupe testified he did not see the patrol car until the signal lights were flashing, and claimed he pulled over as soon as he saw the lights.  He also claimed he was driving at the limit and not speeding.

**Charges, convictions and sentences**

Coulter, Troupe, and Ferreira were tried together in a jury trial.

Coulter was charged with two counts of commercial burglary of Walmart (Pen. Code, § 459)[4].  He was convicted of count I, based on the fishing poles, but found not guilty of count II, based on the air conditioner.  The court found that Coulter had two prior prison term enhancements (§ 667.5, subd. (b)); and an on-bail enhancement (§ 12022.1)

Troupe was convicted as charged of counts I, II, and III, commercial burglary; and count IV, conspiracy to commit burglary.

Ferreira was convicted as charged of counts I and II, commercial burglary; and count IV, conspiracy to commit burglary.[5]

On November 12, 2013, Troupe was placed on probation for five years and ordered to serve 90 days in jail.

On November 15, 2013, the court denied probation for Coulter and sentenced him to an aggregate term of five years; ordered him to serve two years in jail; suspended

---

[4] All further statutory citations are to the Penal Code unless otherwise indicated.

[5] Ferreira was found in possession of methamphetamine when she was booked into jail.  Prior to the jury trial, Ferreira pleaded guilty to count V, bringing drugs into jail (§ 4573); and count VI, possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)).

12.

execution of the final three years of the term; and ordered him to serve that time on postsentence release.

The court similarly sentenced Ferreira to an aggregate term of four years eight months; ordered her to serve two years in jail; suspended execution of the remaining two years eight months; and ordered her placed on postsentence release.

On November 15 and 20, 2013, Coulter and Troupe filed timely notices of appeal. Ferreira is not part of this appeal.

## DISCUSSION

### I.     Admission of Coulter's Prior Convictions

As set forth above, Officer Theodore questioned Coulter after the traffic stop, and testified about his statements regarding the fishing poles:  Coulter initially denied that he was in the store, then admitted he was there, placed the fishing poles on the ground, and claimed he did so because he forgot his wallet in the car.

Coulter contends the court abused its discretion when it permitted the prosecution to introduce evidence of his two prior theft-related convictions to impeach the exculpatory portion of his statements to Officer Theodore, that he left the fishing poles on the ground because he forgot his wallet.

As we will explain, the trial court admitted the prior convictions based on *People v. Jacobs* (2000) 78 Cal.App.4th 1444 (*Jacobs*), which held that "a defendant's prior felony convictions are admissible under Evidence Code sections 1202 and 788 to attack his credibility when, *at his own request*, his exculpatory statement to the police is admitted into evidence, but he does not testify at trial." (*Id*. at p. 1446, italics added, fn. omitted.)

Coulter argues his prior convictions were inadmissible because defense counsel did not purposefully elicit the exculpatory evidence.  We turn to the procedural history leading to the introduction of Coulter's prior convictions.

13.

### A. *Officer Theodore's Direct Examination Testimony*

On direct examination, the prosecutor asked Officer Theodore about his interview with Coulter, which he conducted after the traffic stop.

"Q.    Did you ask [Coulter], or did he tell you, whether or not he was at Wal Mart with anyone?

"A.    He originally denied being inside Wal Mart.

"Q.    And did he later change that story?

"A.    Yes, he did.

"Q.    And what did he say then?

"A.    I advised him that there was video footage, and he was recorded on the video footage inside of Wal Mart, *at which time Mr. Coulter stated he went into Wal Mart, selected two fishing poles, realized that he'd—*

"[COULTER'S DEFENSE ATTORNEY]:    I'm sorry-

"THE WITNESS:   Okay.

"[COULTER'S DEFENSE ATTORNEY]:    Move to strike as nonresponsive.

"THE COURT:    Okay.  [¶]  The motion will be granted.  The jury will disregard the last statement of the witness."  (Italics added.)

The prosecutor next asked Officer Theodore whether Coulter talked about his companions and why they went to Walmart.  Theodore testified that Coulter said he went with Troupe and Ferreira, but he did not give a reason why they went to the store.

"Q.    Did he talk to you about grabbing fishing poles?

"A.    Yes.

"Q.    Did he tell you where he left them?

"A.    Yes.

"Q.    What did he say?

"A.   *He stated that he had left them in the garden area near – next to the fence.*

"Q.   Did you ask him if he slid them underneath the fence?

"A.   Yes.

"Q.   What did he say?

"A.   *He stated he did not*."  (Italics added.)

### B. Cross-examination by Coulter's Defense Attorney

After the prosecutor finished his direct examination, Coulter's attorney was the first defense attorney to cross-examine Officer Theodore.  Coulter's attorney began by asking Officer Theodore about Coulter's postdetention statements regarding the fishing poles.

"Q.   [Y]ou testified earlier that Mr. Coulter told you that he did not put the fishing poles through the fence, correct?

"A.   Yes.

"Q.   Did he tell you where he put them?

"A.   He said he put them alongside the fence.

"Q.   Did he tell you why he put them there?

"A.   He stated he—

"[THE PROSECUTOR]:   Objection, calls for a 'yes' or 'no' answer.  'Did he tell you?'

"THE COURT:   All right.  [¶]  It does.

"THE WITNESS:   Yes.

"[COULTER'S ATTORNEY]:   *What did he tell you about why he put them there?*

"A.   *He stated he realized he did not have his wallet at that point*.

"THE COURT:   Counsel?

15.

"[THE PROSECUTOR]:    I'm not objecting.

"[COULTER'S ATTORNEY]:    He opened the door, so… [¶] Go ahead.

"A.    *He stated that he realized he did not have his wallet at that point, so he set the fishing poles down next to the fence*." (Italics added.)

### C. The Prosecution's Motion to Introduce Coulter's Prior Convictions

At the close of testimony that day, the court excused the jury, and the prosecutor presented the court and the defense attorneys with a motion to impeach the credibility of Coulter's statements to Officer Theodore, with evidence that Coulter had five prior felony convictions. The prosecutor said that "the People did everything we could before this trial to discourage [Coulter's attorney] from bringing in self-serving statements of [Coulter]." Instead, Coulter had introduced evidence of his statement to Theodore – that he left the fishing poles on the floor because he forgot his wallet. The prosecutor stated that Evidence Code section 1202 permitted the admission of Coulter's prior convictions because the defense elicited his exculpatory statement, which attempted to negate Coulter's intent to commit burglary. The prosecutor offered to stipulate to the admission of Coulter's two most recent prior convictions instead of all five.

Coulter's attorney replied that he did not open the door to introduce impeachment evidence. Counsel argued the prosecutor elicited Officer Theodore's testimony, that Coulter admitted he put the fishing poles on the floor, which left it "hanging that there was some guilty reason for doing so, and I'm entitled to fill in … with what he said." Counsel asked for further time to research the issue.

The court said it was inclined to grant the prosecutor's motion because the defense asked Officer Theodore to testify about Coulter's explanation for placing the fishing poles on the floor, that he forgot his wallet. However, the court decided to give counsel time to file an opposition.

Thereafter, Coulter filed opposition and argued that the prosecutor brought up the topic of Coulter's explanation about the fishing poles, but left open the reason why

Coulter left the poles on the floor. Officer Theodore's testimony was incomplete, out of context, and inculpatory. Under the circumstances, Evidence Code section 356 permitted the defense to introduce the rest of Coulter's statement to make it understood.[6]

### D. The Court's Ruling

The court partially granted the prosecutor's motion to admit Coulter's prior convictions. The court acknowledged that under Evidence Code section 356, a party is entitled to introduce the entirety of a witness's statement, but that "is not without consequence."

> "So my ruling is going to be that the People's motion to use impeachment evidence by way of the prior convictions of Mr. Coulter will be allowed; however, I am going to limit the – it is within the Court's discretion, even though it grants the motion, to limit the convictions that may be used.

> "Although [the prosecutor] offered this – and I'm not doing it because [the prosecutor] offered it. I think it is the two most recent [section 496/receiving stolen property] convictions indicating moral turpitude, and I think they can be used for impeachment. So the impeachment will be limited to two [section] 496 convictions in Stanislaus County in September, 2010 and April of 2013."

In light of the court's ruling, Coulter's attorney decided to stipulate to the two prior convictions. The court said it would instruct the jury on the limited admissibility of the evidence.

### E. Stipulation and Instructions

Just before the parties rested, the court read the following stipulation and instruction to the jury:

---

[6] As we will discuss, *post*, Evidence Code section 356 states: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

"Mr. Coulter … has suffered two prior felony convictions. One conviction was on September 24th, 2010, and another one was on April 10, 2013. Those felony convictions were for a violation of Penal Code Section 496, commonly known as receiving or possessing stolen property. They were both felony convictions.

"You may consider this evidence only for a limited purpose, and only for that purpose and no other. And the purpose for which you may consider that evidence in this case is to evaluate the credibility of Mr. Coulter's statements that he made to Officer Theodore.

"The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact, and whether that fact makes those statements less believable.

"So basically, these – this information is only to be used to judge and evaluate the believability and credibility of the statements that Mr. Coulter made to Officer Theodore."

During the instructional phase, the court gave CALCRIM No. 303, limited purpose evidence, and CALCRIM No. 316, witness credibility.

"During trial, certain evidence was admitted for a limited purpose. The limited purpose evidence referred to in this instructions is the two prior felony convictions of the defendant, Timothy Coulter.

"The two prior felony convictions are those on September 24th, 2010 and April 10th, 2013. Both convictions are for violations of Penal Code section 496, commonly known as receiving or possessing stolen property.

"You may consider that evidence only for the limited purpose of evaluating the credibility of Timothy Coulter's statements to Officer Andrew Theodore… and for no other.

"The fact of a felony conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes those statements less believable."

### F. Jacobs and Impeachment Evidence

As explained above, the trial court relied on *Jacobs*, *supra*, 78 Cal.App.4th 1444 to find that Coulter's felony convictions were admissible to impeach the exculpatory

portion of his hearsay statements even though Coulter did not testify. As we will explain, the court's ruling was correct.

In *Jacobs*, the defendant and Lawson were tried together for receiving stolen property; they were arrested for selling stolen equipment out of the trunk of a green car. The defendant told the police that the green car belonged to him, that he bought the equipment from someone named "Will," and he did not know the items were stolen. (*Jacobs*, *supra*, 78 Cal.App.4th at p. 1447.) Prior to trial, Lawson moved to admit a limited portion of the defendant's pretrial statement to the police – that the defendant admitted the green car belonged to him. The defendant objected to the admission of only a portion of his pretrial statement. He moved under Evidence Code section 356 to admit his entire statement to the police, including the exculpatory statements that he bought the items from "Will," and he did not know they were stolen. Both the prosecution and Lawson objected. (*Id*. at p. 1451.) The court overruled the objections and granted the defendant's motion. After the entirety of the defendant's statements to the police were admitted, the prosecution moved to introduce evidence of the defendant's prior felony convictions to impeach the credibility of his exculpatory hearsay statement, even though the defendant did not testify. (*Id*. at pp. 1446, 1448–1449.)

The trial court in *Jacobs* granted the prosecution's motion and held the admission of the defendant's exculpatory statement raised the question of his veracity. While the defendant did not testify, the trial court held " 'the jury should know at least a reasonable amount with regard to that so that it can draw whatever inferences it intends to draw on that issue.' " The trial court limited the impeachment evidence to only theft-related prior convictions, decided that four prior burglary convictions were prejudicial, and permitted impeachment with only two prior convictions. The parties agreed to a stipulation that the defendant had two theft-related prior convictions, and the jury was instructed on the limited admissibility of the impeachment evidence. (*Jacobs*, *supra*, 78 Cal.App.4th at pp. 1448–1449)

On appeal, *Jacobs* rejected the defendant's argument that the court improperly admitted the prior convictions to impeach his exculpatory statements. Since the defendant offered into evidence his hearsay statement with the exculpatory explanation, Evidence Code section 1202 entitled the prosecution to impeach the defendant as though he had testified to that explanation on the stand.[7] *Jacobs* further explained that since the defendant's prior convictions were felonies, Evidence Code section 788 made them specifically admissible to impeach his credibility. (*Jacobs*, *supra*, 78 Cal.App.4th at pp. 1449–1450.)[8]

> "Another party to the litigation should not be prevented from legitimate impeachment of damaging evidence because of [defendant's] decision not to testify. Thus, any form of impeachment – including prior felony convictions – is appropriate to challenge statements regardless of whether they are made under oath. Here, [defendant's] potentially exculpatory out-of-court statement was admitted over objection by both the prosecution and his codefendant. Because [defendant's] factual claims about how he came into possession of the tools could not be challenged by way of cross-examination, their validity could only be challenged by way of an attack on [defendant's] credibility. In that context, the use of the priors was not unfair or inappropriate." (*Jacobs*, *supra*, 78 Cal.App.4th at p. 1451.)

*Jacobs* also rejected the defendant's argument that he only moved to admit the entirety of his statement under Evidence Code section 356 "to 'explain or make clear' the statement about car ownership," and he was not relying on the evidence to bolster his credibility. (*Jacobs*, *supra*, 78 Cal.App.4th at p. 1451, fn. omitted.)

---

[7] Evidence Code section 1202 states, in pertinent part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

[8] Evidence Code section 788 states in pertinent part: "For the purpose of attacking the credibility of the witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony…."

"Here, [*defendant*] sought admission of the portion of his statement which established that he obtained the tools from Will and that he did not know how Will acquired them. The effect of that portion of the statement, if believed, could have been the exoneration of [defendant], to establish a violation of Penal Code section 496, subdivision (a), the prosecution was required to prove that [defendant] *knew* the property had been stolen. The fact that the prosecutor attempted to turn the statement to his advantage in argument does not affect the fact that it was admitted in an effort to defeat the prosecution case. Thus, it was proper for the prosecutor to try to impeach the statement by the use of priors under section 1202." (*Id*. at p. 1452, italics in original.)

*Jacobs* also held that even if Evidence Code section 1202 was inapplicable, the defendant's prior convictions were still admissible to impeach his hearsay statement under article I, section 28, subdivision (f) of the California Constitution (Proposition 8), subject to the limitations of Evidence Code section 352. (*Jacobs*, *supra*, 78 Cal.App.4th at p. 1453.)

A similar situation was addressed in *People v. Little* (2012) 206 Cal.App.4th 1364 (*Little*), where the defendant was charged with intent to commit larceny. An officer testified about the defendant's inculpatory statements. Defense counsel cross-examined the officer, and elicited testimony about the defendant's exculpatory statements. The defendant did not testify, and the court relied on *Jacobs* and granted the prosecution's motion to impeach the defendant's hearsay statements with his prior theft-related conviction. (*Little*, *supra*, at pp. 1373–1374.)

*Little* rejected the defendant's assertion that *Jacobs* was wrongly decided.

"We see no reason to depart from the reasoning of [*Jacobs*]. As the appellate court in *Jacobs* observed, if Jacobs had chosen to testify, Evidence Code section 788 would have permitted the prosecution to challenge his credibility with prior conviction evidence. [Citation.] Should he have been allowed to avoid a challenge to his credibility, and undercut the operation of section 788, by the simple device of putting on exculpatory hearsay evidence without taking the witness stand?

"Evidence Code section 1202, upon which the *Jacobs* court also relied, closes the door on any such chicanery…. As the *Jacobs* court

21.

concluded, 'Taken together, sections 1202 and 788 seem to provide that evidence of prior felony convictions is admissible to attack the credibility of a hearsay declarant.' [Citation.] This reasoning is sound.

"If Little had testified, the prosecution could have challenged his credibility with prior conviction evidence under Evidence Code section 788. Instead of testifying, Little sought to bring in exculpatory alibi evidence via a hearsay declaration. Evidence Code section 1202 permitted the prosecution to challenge his credibility with prior conviction evidence, just as it would have been entitled to do if he had taken the witness stand and testified in open court that he was in church at the time of the attempted credit card usage …." (*Little*, *supra*, 206 Cal.App.4th at pp. 1374–1375.)

*Little* acknowledged that the defendant did not rely on Evidence Code section 356 to introduce his exculpatory hearsay statement, but held that factor did not distinguish the case from *Jacobs*:

"It is true that we have no Evidence Code section 356 issue in the case before us. However, that distinction does not make [*Jacobs*] inapposite. Rather, if the impeachment evidence should have been admitted on the facts of *Jacobs,* then a fortiori it should have been admitted in the case before us. *The point of Jacobs is that if a defendant is going to put his hearsay declaration into evidence, he cannot preclude the prosecution from testing his credibility*. One could argue that the decision to put the hearsay declaration in evidence was less voluntary in *Jacobs* than in the case before us. Jacobs's hand was forced. Lawson sought to bring in the hearsay declaration in an effort to save himself and place the blame on Jacobs. Because of Lawson's tactic, Jacobs sought to protect himself by placing the entirety of his hearsay declaration into evidence.

"In the matter before us, however, the decision to place the hearsay declaration into evidence was solely the tactic of Little. He was not boxed in by a codefendant. Once Little took it upon himself to put his hearsay declaration in issue, the prosecution was entitled to test his credibility as the hearsay declarant. [Citation.]" (*Little*, *supra*, 206 Cal.App.4th at p. 1376, italics added.)

*Little* also agreed with *Jacobs's* conclusion that the evidence was admissible under article I, section 28, subdivision (f) of the California Constitution. (*Little*, *supra*, 206 Cal.App.4th at p. 1375.)

22.

## G. Analysis

Coulter acknowledges the holdings in *Jacobs* and *Little*, but contends they were wrongly decided and misinterpreted Evidence Code sections 1202 and 787. Coulter argues it was fundamentally unfair to admit his prior convictions when he did not testify. (AOB 12-14) We reject the Coulter's contentions for the same reasons set forth in *Jacobs* and *Little*, and agree with the holdings in those cases.

Coulter further argues the court abused its discretion under Evidence Code section 352 when it decided to permit impeachment with prior convictions which were recent, theft-related property crimes, and thus similar to the charged offenses. As in *Jacobs* and *Little*, however, the court herein conducted the requisite weighing process and minimized the possible prejudicial effect by limiting impeachment to Coulter's two most recent felonies of moral turpitude, which were relevant and probative of Coulter's intent. (See, e.g., *Jacobs*, *supra*, 78 Cal.App.4th at p. 1453; *Little*, *supra*, 206 Cal.App.4th at pp. 1378–1379 [trial court properly limited prior convictions to most recent offenses of moral turpitude "not wanting to use any conviction that was stale"].) The court agreed with the parties' stipulation on the impeachment evidence, and instructed the jury on the limited admissibility of the prior convictions. "This shows that the court was concerned that the evidence be presented in a manner that offered probative value, as opposed to prejudicial effect." (*Little*, *supra*, 206 Cal.App.4th at p. 1378.)

Coulter also argues that admitting his prior convictions to impeach his exculpatory statements was unfair because the prosecutor initially asked Officer Theodore about his pretrial statements, and Coulter was compelled to introduce the entirety of his statements pursuant to Evidence Code section 356. However, a defendant's reliance on Evidence Code section 356 does not permit him to introduce exculpatory hearsay statements without regard to impeachment. Indeed, the prosecutor in this case advised the court that "the People did everything we could before this trial to discourage [Coulter] from

23.

bringing in [his] self-serving statements" to negate his intent to steal the fishing poles, thus triggering the admission of the impeachment evidence.

We note that in *People v. Fritz* (2007) 153 Cal.App.4th 949 (*Fritz*), the court distinguished *Jacobs* and held that when *the prosecution* offers the defendant's hearsay statements into evidence, it has "no right to impeach it." (*Id*. at p. 956.) In *Fritz*, the defendant did not testify, and the trial court initially excluded evidence of the defendant's prior theft convictions. In contrast to *Jacobs* and *Little*, however, the defendant "did nothing to place his credibility at issue," and he did not offer his exculpatory hearsay statements into evidence. *Fritz* explained that if he had done so, "the prosecutor would have been entitled to offer evidence impeaching his credibility" under *Jacobs*. (*Fritz*, *supra*, 153 Cal.App.4th at pp. 955, 956.) Nevertheless, the trial court granted the prosecutor's motion to introduce the entirety of the defendant's hearsay statement, including the exculpatory portion, even though it was only relevant for the purpose of impeaching it under *Jacobs* with evidence of his prior convictions. *Fritz* held the trial court's ruling constituted prejudicial error: "[B]ecause it was the prosecutor, rather than [defendant], who offered the statement into evidence in this case, the prosecutor had no right to impeach it." (*Fritz*, *supra*, at p. 956.) "[T]hat was bootstrapping, and improper." (*Ibid*.)[9]

In this case, however, Coulter's pretrial hearsay statements to Officer Theodore were highly relevant because of his contradictory explanations, entirely separate and apart from his exculpatory claim of forgetting his wallet. Coulter initially denied being in the store; once he was confronted with the existence of the store's security videotapes,

---

[9] *Fritz* was criticized by *People v. Osorio* (2008) 165 Cal.App.4th 603, 617, which held that Evidence Code sections 785 and 1202 "allow a prosecutor to use a prior inconsistent statement to partially impeach a hearsay statement the prosecutor had previously introduced."

Coulter admitted he went into Walmart. In contrast to *Fritz*, the prosecution did not introduce the evidence merely to contradict it. (*Fritz*, *supra*, 153 Cal.App.4th at p. 956.)

Finally, Coulter asserts the admission of his prior convictions violated his constitutional rights to due process and a fair trial. However, even the erroneous admission of evidence does not offend due process rights unless it is so prejudicial as to render the proceeding arbitrarily and fundamentally unfair. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; *People v. Albarran* (2007) 149 Cal.App.4th 214, 229–232; *People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042.) We decline to find a due process violation in this case.

## II.    Admission of Ferreira's Statements About Troupe

As set forth in the factual summary above, Officer Theodore testified about his postdetention interviews of defendants Coulter and Troupe. He also testified about his interview with Ferreira; defendants did not object to his testimony about Ferreira's statements. Troupe was the only defendant who testified at the joint trial.

On appeal, Troupe contends for the first time that the admission of Officer Theodore's testimony about Ferreira's postdetention statements, where Ferreira discussed Trouple's statements about the air conditioner, violated his Sixth Amendment right to confront and cross-examine witnesses pursuant to *Aranda/Bruton* because Ferreira did not testify and her statements implicated Troupe.

As Troupe acknowledges, however, his defense attorney did not object to Theodore's testimony about Ferreira's statements. The failure to object waives appellate review of alleged *Aranda/Bruton* error. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1044.)

In the alternative, Troupe argues counsel was prejudicially ineffective for failing to do so. The People assert counsel was not ineffective and the evidence was admissible under *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*), since Ferreira's statements about Troupe were not "facially incriminating."

25.

### A. *Ineffective Assistance*

"In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.)

" 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' [Citation.] 'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight.... A reviewing court will not second-guess trial counsel's reasonable tactical decisions.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.)

We thus turn to Troupe's *Aranda/Bruton* contentions to determine if counsel was prejudicially ineffective.

### B. *Aranda, Bruton, and Richardson*

In *Bruton,* the United States Supreme Court held that a defendant is denied his Sixth Amendment right of confrontation when the trial court admits a nontestifying codefendant's confession that names and incriminates the defendant at their joint trial, even where the jury is instructed to consider the confession only against the codefendant. (*Bruton, supra,* 391 U.S. at pp. 124–126, 135–136.) *Bruton* further held that even when so instructed, jurors cannot be expected to ignore the statements of one defendant that are "powerfully incriminating" as to another defendant. (*Id.* at pp. 135-136.) *Bruton* emphasized that the confession at issue was clearly inadmissible against the defendant as

hearsay and that no recognized exception to the hearsay rules applied. (*Id.* at p. 128, fn. 3.)

In *Aranda,* a case decided before *Bruton,* the California Supreme Court reached a similar conclusion on similar facts. (*Aranda, supra,* 63 Cal.2d at p. 530.)[10] Under the *Aranda/Bruton* line of cases, to admit a codefendant's out-of-court statement that implicates another defendant in the same trial, the prosecution must edit the statement in a manner that will not allow the jury to infer that it implicates the nondeclarant defendant. (*Fletcher, supra,* 13 Cal.4th at pp. 468–469.)

*Bruton* was later qualified by *Richardson, supra,* 481 U.S. 200, which held that *Bruton* "extends only to confessions that are not only 'powerfully incriminating' but also 'facially incriminating' of the nondeclarant defendant. [Citation.] The [*Richardson*] court held that a defendant's rights under the confrontation clause are not violated by the admission in evidence of a codefendant's confession that has been redacted 'to eliminate not only the defendant's name, but any reference to his or her existence,' even though the confession may incriminate the defendant when considered in conjunction with other evidence properly admitted against the defendant. [Citation.]" (*People v. Fletcher, supra,* 13 Cal.4th at pp. 455–456.)

*Richardson* noted that in *Bruton*, the codefendant's confession expressly implicated the defendant as his accomplice, so that "there was not the slightest doubt that it would prove 'powerfully incriminating.' [Citation.] By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony). [¶] *Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not*

---

[10] *Aranda* has since been abrogated by the "truth-in-evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) to the extent it excluded relevant evidence that would be admissible under the federal constitution. (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

*likely obey the instruction to disregard the evidence.* Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; *whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. In short, while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of Bruton's exception to the general rule."* (Richardson, supra, 481 U.S. at p. 208.*)*

*Richardson* concluded:

"The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. On the precise facts of *Bruton,* involving a facially incriminating confession, we found that accommodation inadequate. [T]he calculus changes when confessions that do not name the defendant are at issue. While we continue to apply *Bruton* where we have found that its rationale validly applies, [citation], we decline to extend it further. *We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.* (Richardson, supra, 481 U.S. at p. 211, italics added.)

In *Gray v. Maryland* (1998) 523 U.S. 185 (*Gray*), the United States Supreme Court returned to the issue it left unresolved in *Richardson,* where "[t]he State ... simply replaced the nonconfessing defendant's name with a kind of symbol, namely, the word 'deleted' or a blank space set off by commas." (*Id.* at p. 192.)

"*Bruton,* as interpreted by *Richardson,* holds that certain 'powerfully incriminating extrajudicial statements of a codefendant' – those naming another defendant – considered as a class, are so prejudicial that limiting

28.

instructions cannot work.  [Citations.]  Unless the prosecutor wishes to hold separate trials or to use separate juries or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found.  Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that, in our view, the law must require the same result." (*Ibid.*)

*Gray* acknowledged that *Richardson* "placed outside the scope of *Bruton's* rule those statements that incriminate inferentially….  But inference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton's* scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,' [citation], and perhaps even full names of defendants who are always known by a nickname.  This Court has assumed, however, that nicknames and specific descriptions fall inside, not outside, *Bruton's* protection.  [Citations.]" (*Gray, supra*, 523 U.S. at p. 195.)

*Gray* explained that *Richardson* instead depended "in significant part upon the *kind* of, not the simple *fact* of, inference.  *Richardson's* inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence introduced later at trial.' [Citation.]  The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.  Moreover, the redacted confession with the blank prominent on its face, in *Richardson's* words, '*facially* incriminat[es]' the codefendant.  [Citation.]  Like the confession in *Bruton* itself, the accusation that the redacted confession makes 'is more vivid than inferential incrimination, and hence more difficult to thrust out of mind.'  [Citation.]" (*Gray, supra*, 523 U.S. at p. 196, italics in original.)

*C. Analysis*

The People rely on *Richardson* and argue defense counsel was not ineffective for failing to object to Officer Theodore's testimony, where he recounted Ferreira's statements about Troupe. The People assert that Ferreira's references to Troupe did not violate *Bruton* because her statements were not facially incriminating to Troupe without linkage to other evidence.

As we have explained, however, *Richardson* and *Gray* did not simply exclude from *Bruton* evidence which was not "facially incriminating." Instead, *Richardson* held that where a nontestifying codefendant's confession was not incriminating on its face, and became so only when linked with other evidence, the jury is more likely to obey a limiting instruction. In such situations, the defendant's Sixth Amendment rights are not violated when the statements from the nontestifying codefendant are admitted "with a proper limiting instruction" and "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Richardson, supra*, 481 U.S. at p. 211.)

In this case, the court and the parties never discussed redacting any part of Ferreira's statements about Troupe. Defense counsel never objected to introducing Ferreira's unredacted statements or asked for a limiting instruction. Officer Theodore testified without any limitations about Ferreira's postdetention statements, including her account of Troupe's statements that day. *Richardson* and *Gray* thus do not apply to the evidence introduced herein.

We further note that if the nontestifying codefendant's statement is admissible against the defendant "under a hearsay exception, and its admission otherwise survives confrontation analysis, then the jury may consider it against the codefendant; no reason exists for severance or redaction. [Citation.]" (*People v. Smith* (2005) 135 Cal.App.4th 914, 922.) Defense counsel did not raise a hearsay objection and the court did not address this issue. While Troupe's statements to Ferriera were arguably admissible under

30.

the coconspirator's exception to the hearsay rule (Evid. Code, § 1223), Ferreira's statements to Officer Theodore were not admissible under any hearsay exception. (Cf. *People v. Smith*, *supra*, 135 Cal.App.4th at p. 922.)

We are left to conclude that Officer Theodore's testimony about Ferreira's statements regarding Troupe violated *Bruton*. *Bruton* error is reviewed under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*People v. Song* (2004) 124 Cal.App.4th 973, 981.) The error is deemed harmless if " 'the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence ....' [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 232.)

As noted above, however, defense counsel failed to object, and we must determine whether his alleged ineffectiveness was prejudicial. "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 357–358.)

We find that the admission of Officer Theodore's testimony, in which he recounted Ferreira's statements about Troupe, was not prejudicial under either standard. Troupe complains that Ferreira's statements were damaging because she directly implicated him in the charged offenses, whereas the surveillance videotape failed to prove his intent to commit burglary and conspiracy. However, Ferreira's statements to Theodore were merely cumulative of the other, more damaging evidence in this case. Troupe's knowledge, intent, and complicity were overwhelmingly established by his own statements to Theodore, and his attempt at trial to explain his conduct as shown on the surveillance videotape.

When Officer Theodore initially interviewed him, Troupe claimed an unknown person was supposed to bring an air conditioner to Walmart so Ferreira could return it.

Troupe also claimed he let Ferreira use his identification to return the unit. Theodore advised Troupe that he was going to check the store's security videotape, and Troupe assured him that "what he told me would be exactly what I would observe in the video footage." When Theodore confronted Troupe with inconsistencies in his story, Troupe admitted that he put an air conditioner into Ferreira's shopping cart, "but did not believe that that air conditioner had any relation to the air conditioner that they were there to do the return for," and it was a completely different air conditioner. Theodore asked how many air conditioners he saw. Troupe said he just saw that one.

At trial, Troupe testified that Ferreira was supposed to return an item for someone, but hedged as to whether that item was an air conditioner. On cross-examination, Troupe admitted that an air conditioner had been discussed. Troupe also admitted he put an air conditioner in Ferreira's shopping cart, this unit was the only air conditioner he saw, and he placed it on the customer service counter. Troupe then gave two different reasons for that act: Ferreira wanted to know about the capacity of the unit; and/or the store needed to use some item of merchandise to determine whether he could return something, and he used the air conditioner since it was in Ferreira's cart.

Troupe's inconsistent stories were undermined by the surveillance videotape. Troupe and Ferreira walked through the store together, split up, and then met again; Troupe discarded his shopping cart as Ferreira went to the customer service department with the air conditioner; he went to the parking lot and then returned to Ferreira's location several times as she waited to make the return; he used the cart doors to leave the store; he placed the unit on the customer service desk; and he stood with Ferreira at the counter as the clerk was about to process the return. As Ferreira finished the transaction, Troupe returned to his car and moved it from the parking space to the area immediately in front of the store. After she was confronted by store employees, Ferreira ran to the parking lot and shouted for him to go; he sped off and the car's convertible top was

32.

closed. When Officer Theodore tried to conduct a traffic stop, Troupe attempted to elude him and reached 70 to 80 miles per hour before he finally stopped.

We thus conclude that even if defense counsel should have objected to the admission of Ferreira's statements, and the court either excluded or redacted the evidence, the error was not prejudicial since Troupe's own statements and actions were far more inculpatory and damaging than Ferreira's statements, given the inconsistencies between his stories and the videotape.

## **DISPOSITION**

The judgments are affirmed.


_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
PEÑA, J.

33.